**John FURTADO et al.,
Plaintiffs-Appellees,**

v.

**Harold BISHOP et al.,
Defendants-Appellants.**

**John FURTADO et al.,
Plaintiffs-Appellants,**

v.

**Harold BISHOP et al.,
Defendants-Appellees.**

**Nos. 78–1482, 78–1483.**

United States Court of Appeals,
First Circuit.

Argued March 2, 1979.

Decided July 26, 1979.

Lee Carl Bromberg, Sp. Asst. Atty. Gen., Dept. of Correction, Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief for Harold Bishop, et al.

Max D. Stern, Boston, Mass., with whom Jonathan Shapiro, Stern & Shapiro and Michael Avery, Boston, Mass., were on brief for John Furtado, et al.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, PETTINE, District Judge.**

BOWNES, Circuit Judge.

This case stems from two separate but related incidents at the Massachusetts Correctional Institution (MCI) at Walpole on March 21, 1970. Prison officials observed prisoners John Furtado and Gerald Sousa returning to their respective cells after attending a banquet at the auditorium sponsored by inmates involved in a prison drug program. Sousa had consumed some home brew and his gait and general appearance made it obvious that he was less than sober. Furtado later testified that he had nothing to drink at the banquet. Both men went into their cells shortly before ten o'clock and presumably fell asleep. Based on the observations made and because it was known that both had been at the banquet, the prison officials, after going through the appropriate chain of command, decided to move Sousa and Furtado out of their cells and search for contraband. As the guards attempted to usher him to a segregated area in Cell Block 9, a melee erupted between Sousa and the guards. There was further turmoil when a second group of guards attempted to move Furtado out of his cell. Both men claimed to have been beaten by the guards. Furtado was injured more seriously than Sousa; he bled profusely, was obviously in pain and an X-ray showed that his jaw was slightly fractured. He was taken to the prison hospital.

While Furtado was in the prison hospital, Sousa wrote a series of letters complaining that he and Furtado had been brutally and unjustly beaten and seeking redress. On March 23, he wrote to the Norfolk County District Attorney's office. By the time his letter was delivered on March 26, State Police Officer Reilly had already been called in by Walpole Superintendent Moore to investigate the incidents. On March 24, Sousa wrote to Dr. Miriam Van Waters, a former Superintendent of MCI Framing-

ham whom he knew, but Deputy Superintendent Butterworth returned the letter to Sousa and asked him to delete the name of an officer he accused of directing the beatings. Sousa wrote Dr. Van Waters again on March 27 and also wrote Chief Judge Charles Wyzanski of the United States District Court.

Furtado and Sousa had, themselves, been the subject of several disciplinary reports written by prison officers involved in the incidents. Deputy Superintendent Butterworth, who had commenced his own investigation of the incident on March 23 and had read the reports, recommended to Superintendent Moore that Furtado and Sousa be transferred to departmental segregation units (DSU). In April, upon Moore's recommendation, Commissioner of Correction Fitzpatrick transferred Furtado to DSU Walpole and Sousa to DSU Bridgewater, where they spent approximately six months.[1]

In December, 1970, Furtado and Sousa filed a lawsuit under 42 U.S.C. § 1983 against various guards and prison officials and also moved for a preliminary injunction asking the district court to enjoin defendants from intercepting and reading any correspondence from plaintiffs to and from their attorneys, to order defendants to allow plaintiffs or their representatives to interview plaintiffs and potential witnesses in privacy and to permit nonlawyers to conduct the interviews, to enjoin defendants from interfering in any way with the conduct of the lawsuit, and to restore plaintiffs to the general prison population. After a hearing, the district court granted, with some modification, the relief requested except for transfer out of segregation to the general prison population.

After a long unexplained delay, the case was assigned to another judge for trial in November of 1977. Prior to the start of the scheduled jury trial in March of 1978, plaintiffs filed a second amended complaint,

---

** Of the District of Rhode Island, sitting by designation.

1. Both men were found by a disciplinary board to have violated prison rules, but the Board's action in Sousa's case came one day *after* Moore had recommended Sousa's transfer.

which was assented to by defendants. The complaint alleged unjustified assaults and beatings and use of excessive force against both plaintiffs. It asserts that Sousa was held under conditions of solitary confinement at DSU Bridgewater for six months without cause, with no hearing or notice of charges, that the defendants knew or should have known that the reports made against Sousa were false, and that he was transferred to DSU Bridgewater "at least in part" because he attempted to obtain legal redress for the beating administered on March 21, 1970, "by attempting to write to the United States District Court and by attempting to mail letters seeking legal assistance, which attempts were frustrated by defendant Butterworth." Essentially the same allegations were made as to Furtado's confinement in the segregation unit at Walpole. Damages were sought for the beatings, for the confinement in segregation, for the alleged deprivation of due process and deprivation of their right to communicate with the outside world and the courts.

Eleven special interrogatories were submitted to the jury which can be summarized as follows: (1) was improper physical force applied on the night of March 21, 1970; (2) which of the defendants participated in the application of such force, either directly or by failing to stop it (the defendants were listed with a space for a yes or no answer opposite each name); (3) the amount of compensatory damages for the use of improper physical force; (4) the amount of punitive damages; (5) did any defendants make an intentionally false report to cover up the events of the night of March 21, 1970 (with a list of defendants' names for checking if applicable); (6) did any of the defendants make an intentionally false report or recommendation with the purpose or expectation that it would lead to segregated confinement (with a list of defendants' names for checking if applicable); (7) compensatory damages for segregation; (8) punitive damages for segregation; (9) did defendant Butterworth suppress the second letter to Dr. Van Waters; (10) did defendant Butterworth suppress a letter to Judge Wyzanski; and (11) did defendant Butterworth recom-

mend segregation for Sousa because of his writing to Dr. Van Waters and/or Judge Wyzanski—with an additional question as to the amount of compensatory and punitive damages if applicable.

In response to the interrogatories, the jury found that three types of wrongdoing had occurred: (1) that certain defendants used or countenanced the use of excessive force against Furtado and Sousa; (2) that guards Scholes and Saulnier and Deputy Superintendent Butterworth made false reports or recommendations with the purpose or expectation they would lead to segregated confinement for Furtado and Sousa; and (3) that Butterworth suppressed the second letter to Dr. Van Waters and the letter to Judge Wyzanski and recommended segregation for Sousa because of his letter writing. The jury awarded Furtado $8,000 and Sousa $4,500 in compensatory damages for the use of excessive force against them, Furtado $1,000 and Sousa $9,000 in compensatory damages for segregated confinement, and Sousa $3,000 in compensatory damages and $3,000 in punitive damages for Butterworth's mail suppression and recommendation of segregation. After deleting $1,000 in compensatory damages against Butterworth as redundant, the district court entered a judgment of $56,444.45, which included prejudgment interest, costs, and attorney's fees.

The defendants have appealed the entire judgment, and the plaintiffs have cross-appealed from the portion of the judgment concerning attorney's fees. The issues on appeal cluster around four aspects of the case: (1) the recovery of damages for the plaintiffs' segregated confinement; (2) evidentiary rulings; (3) the judge's instructions to the jury; and (4) prejudgment interest and attorney's fees. We address these issues in order.

## THE RECOVERY OF DAMAGES FOR SEGREGATED CONFINEMENT

The defendants have concentrated much of their effort on attacking the award of damages against Saulnier, Scholes, and But-

terworth for making false reports or recommendations to bring about the plaintiffs' transfers to segregated confinement. Saulnier wrote a report in which he accused Sousa of being "very high on drugs or booze," refusing to go to Block 9, and fighting, kicking, and taking a swing at an officer; he recommended the "[m]aximum penalty this man can get." Scholes' report similarly accused Furtado of refusing to obey orders to move and of hitting, kicking, and biting officers. As noted above, Butterworth conducted an investigation and ultimately recommended the transfers.

The plaintiffs' theory, accepted by the jury, was that the guards had attacked them and that certain of the defendants had made false reports and recommendations in order to "cover up" the assaults and beatings with the purpose or expectation that such reports would result in segregated confinement. According to this theory, defendants were liable for plaintiffs' confinement in segregation because it constituted arbitrary and capricious or grossly disproportionate punishment for drinking and refusing to obey orders,[2] in violation of the eighth amendment and the substantive due process guarantee of the fourteenth amendment and because it was imposed in part to frustrate plaintiffs' right of access to the courts, in violation of the first amendment and the due process clause of the fourteenth amendment.

As we understand defendants' position, they contest plaintiffs' recovery of damages for segregated confinement on four grounds. First, they contend, more emphatically in oral argument than in their briefs, that they had no notice that the plaintiffs sought damages for conditions in segregation on the theory that the transfers to segregation for improper motives violated the eighth and fourteenth amendments. After carefully reviewing plaintiffs' second amended complaint, we find no merit in this position. The complaint sufficiently pled the plaintiffs' theory of recovery for segregation,[3] and, in the detailed description of the privileges lost in segregation and of the vile conditions endured by Sousa at DSU Bridgewater, there was ample warning that the plaintiffs were seeking damages for the conditions of segregated confinement.[4] Defendants also had the benefit of plaintiffs' proposed jury instructions, which were filed several days before trial and in which plaintiffs claimed a right not to be arbitrarily singled out for punitive and degrading treatment and sought damages for time spent in segregation.

Second, and more fundamentally, defendants contend that plaintiffs' theory of recovery under the eighth and fourteenth amendments was erroneous as a matter of law. They reason that, in the wake of the

2. Sousa, but not Furtado, admitted drinking home brew on the evening in question. Both men arguably refused to obey certain orders to move; there was evidence they protested because Superintendent Moore had promised an end to "shakedowns" of cells after 10:00 p. m.

3. The complaint contained specific allegations that some of the defendants had made false reports that the plaintiffs had created a disturbance and that, as a result, Sousa and Furtado were transferred to DSU. There were further allegations that the "acts of defendants in causing the plaintiffs to be transferred to the departmental segregation units . . . were arbitrary and capricious, deprived plaintiffs of their rights to due process of law . . . [and] to be free of cruel and unusual punishment . . . . as guaranteed by the Eighth and Fourteenth Amendments . . . ."

4. The complaint stated that in segregation the plaintiffs were held in virtual twenty-four hour lockup, were not permitted to have personal belongings, to watch television, or to listen to the radio, were denied access to rehabilitative programs, and had their visits and correspondence severely curtailed. The following description of conditions at DSU Bridgewater was given:

DSU Bridgewater . . . was located in an ancient and dilapidated building. There was no plumbing. Plaintiff [Sousa] had to use a dry pot which was emptied only once per day. His cell was infested with cockroaches. Above the segregation unit were held violent uncontrollable patients from the hospital portion of M.C.I. Bridgewater. These patients disturbed DSU inmates by making constant noise and by urinating on their floor. In spite of the above unhygienic conditions, DSU Bridgewater inmates were permitted to wash in a sink only once per day and shave and shower twice per week.

Supreme Court decisions in *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), and our own post-*Meachum* decisions in *Daigle v. Hall*, 564 F.2d 884 (1st Cir. 1977); *Four Certain Unnamed Inmates v. Hall*, 550 F.2d 1291 (1st Cir. 1977), and *Lombardo v. Meachum*, 548 F.2d 13 (1st Cir. 1977), the plaintiffs' transfers were not actionable.

■■ The initial difficulty with this argument is that, as we read the record, it was not raised below.[5] We will not ordinarily consider on appeal grounds for reversal that were not urged upon or considered by the district court. *E. g., Johnston v. Holiday Inns, Inc.*, 595 F.2d 890, 894 (1st Cir. 1979); *Dobb v. Baker*, 505 F.2d 1041, 1044 (1st Cir. 1974). Although we have acknowledged our power to notice plain error in order to avert a clear miscarriage of justice, *Morris v. Travisono*, 528 F.2d 856, 859 (1st Cir. 1976), we only exercise that power if the new ground is "so compelling as virtually to insure appellant's success." *Dobb v. Baker, supra*, at 1044. This is not the case here.

■ The Supreme Court's prison transfer decisions did not clearly foreclose plaintiffs' theory of recovery of damages for their segregated confinement. In *Meachum v. Fano, supra*, 427 U.S. at 216, 96 S.Ct. 2532, and *Montanye v. Haymes, supra*, 427 U.S. at 242, 96 S.Ct. 2543, the Court held that the due process clause of the fourteenth amendment does not require a hearing before a prisoner is transferred from one state

prison to another having harsher conditions, unless a state law or practice creates a liberty interest in continued confinement at the first prison by conditioning transfers on misconduct or other events. In *Meachum*, the Supreme Court reversed a decision of this court, *Fano v. Meachum*, 520 F.2d 374 (1st Cir. 1975), holding that transfers from MCI Norfolk to MCI Walpole and Bridgewater implicated a liberty interest and required certain due process protections. Interpreting the Supreme Court's decisions, we held in *Daigle v. Hall, supra*, 564 F.2d at 885–886, and *Four Certain Unnamed Inmates v. Hall, supra*, 550 F.2d at 1292, that a prisoner's transfer to DSU Walpole did not implicate any liberty interest or violate procedural due process of law. *See also Sisbarro v. Warden, Massachusetts State Penitentiary*, 592 F.2d 1, 2–4 (1st Cir. 1979) (interstate transfers); *Lombardo v. Meachum, supra*, 548 F.2d at 13–15 (transfer from MCI Norfolk to MCI Walpole). All of these cases addressed an issue of procedural due process: what, if any, procedural protections must accompany a transfer.

Nothing in these decision expressly ruled out a challenge to a transfer to segregation on the ground that it violated constitutional rights other than the right to procedural due process of law.[6] In fact, in *Montanye v. Haymes, supra*, 427 U.S. at 242, 96 S.Ct. 2543, the Supreme Court indicated that the conditions or degree of a prisoner's confinement could be "otherwise violative of the Constitution," and the dissenters understood the Court to agree that Montanye would have a cause of action to the extent

---

5. Defendants' trial counsel did object strenuously to the admission of evidence of the conditions at the DSU, but he did so on the ground that the named defendants could not be held responsible for the transfers (which were ultimately ordered by the Commissioner of Correction) or for the conditions in the DSU. When he moved for a directed verdict for Butterworth, it was on similar grounds. No objections were taken to the judge's charge or to interrogatories encompassing plaintiffs' theory of recovery. Nowhere in the record can we find any objections to the trial judge that plaintiffs' theory of recovery for segregation was, as appellate counsel now characterizes it, "bogus." To the contrary, in defendants' requests

for jury instructions, they appear to concede liability if they "acted intentionally or maliciously or in bad faith to segregate the plaintiffs from the general population."

6. Although defendants seize upon language in *Meachum v. Fano*, 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976), to the effect that "prison officials have discretion to transfer [prisoners] for whatever reason or for no reason at all," we understand this statement to describe the applicable Massachusetts law in that case and not to constitute a pronouncement that a transfer can never violate the Constitution.

he claimed his transfer was in retribution for the exercise of his first amendment rights. *Id.* at 244 and n.*,[7] 96 S.Ct. 2543. Defendants themselves do not seriously dispute that plaintiff's transfers to segregation were actionable if they violated plaintiffs' right of access to the courts, one theory of recovery advanced.

By the same token, plaintiffs' theory that recovery for segregated confinement could also be based upon the eighth and fourteenth amendments is not commonplace and widely accepted. Although it is established that conditions in segregation can be so barbaric as to constitute cruel and unusual punishment, *e. g., Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), plaintiffs freely admit that they did not pursue this type of eighth amendment claim. Rather, they contended that the punishment exacted was cruel and unusual because it was arbitrarily imposed to cover up brutality and was grossly disproportionate to whatever offenses they had committed. It is true that the Supreme Court has stated many times that a grossly disproportionate penalty can offend the eighth amendment, *e. g., id.* at 685, 98 S.Ct. 2565; *Weems v. United States,* 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910), but the Court does not appear to have applied this concept to prison disciplinary measures such as segregation.[8] Nevertheless, a few lower courts have done so. *Chapman v. Kleindienst,* 507 F.2d 1246, 1252 (7th Cir. 1974); *Wright v. McMann,* 460 F.2d 126, 132–33 (2d Cir.), *cert. denied,* 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972); *Hardwick v. Ault,* 447 F.Supp. 116, 125–27 (M.D.Ga. 1978). *See Bono v. Saxbe,* 450 F.Supp. 934, 944 (E.D.Ill.1978); *Fitzgerald v. Procunier,* 393 F.Supp. 335, 342 (N.D.Cal.1975). Simi-

larly, some courts have indicated that segregated confinement amounts to cruel and unusual punishment or a violation of substantive due process if it is imposed arbitrarily and without basis. *Wilwording v. Swenson,* 502 F.2d 844, 851 (8th Cir. 1974), *cert. denied,* 420 U.S. 912, 95 S.Ct. 835, 42 L.Ed.2d 843 (1975); *Black v. Warden, United States Penitentiary,* 467 F.2d 202, 203–04 (10th Cir. 1972); *United States ex rel. Bennett v. Prasse,* 408 F.Supp. 988, 999 (E.D.Pa. 1976). We, ourselves, have recognized that punishment of prisoners may not be "extremely disproportionate, arbitrary or unnecessary." *O'Brien v. Moriarty,* 489 F.2d 941, 944 (1st Cir. 1974). *See Feeley v. Sampson,* 570 F.2d 364, 371 (1st Cir. 1978); *Nadeau v. Helgemoe,* 561 F.2d 411, 419 (1st Cir. 1977). Given the state of the law in this area, we certainly cannot say that plaintiffs' theory of recovery for segregated confinement was plainly erroneous.

Defendants' third argument, which was made in various forms below,[9] is that there was insufficient evidence to impose liability on Butterworth, Scholes, and Saulnier for transfers of plaintiffs to segregation. Defendants reason that, because the decisions to transfer were ultimately made by Commissioner of Correction Fitzpatrick,[10] who was not a defendant, on the recommendation of Superintendent Moore, who was dropped as a defendant, their false reports and recommendations were not proved to have caused the transfers to segregation. In a variation on this theme, defendants contend that Moore and Fitzpatrick may have had their own valid reasons for effecting the transfers, and that there was an "unrebutted, rational and nondiscriminatory basis" for the transfers, *Laaman v. Per-*

---

**7.** Montanye had pursued this claim below and the Second Circuit found that he had standing to raise a first amendment challenge to his transfer. *Haymes v. Montanye,* 547 F.2d 188, 189–90 (2d Cir. 1976), *cert. denied,* 431 U.S. 967, 97 S.Ct. 2925, 53 L.Ed.2d 1063 (1977). *Compare Sisbarro v. Warden, Massachusetts State Penitentiary,* 592 F.2d 1, 4 (1st Cir. 1979) (no first amendment claim articulated).

**8.** *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565 (1978), did involve punitive isolation, but there

the Supreme Court upheld a thirty day limitation on such confinement in an Arkansas prison on the theory that conditions were barbarous rather than that the punishment was grossly disproportionate. *Id.* at 685–88, 98 S.Ct. 2565.

**9.** *See* n. 5, *supra.*

**10.** Fitzpatrick had the statutory authority to transfer. Mass.Gen.Laws ch. 127, § 39.

*rin*, 435 F.Supp. 319, 328 (D.N.H.1977), in Sousa's drinking and both plaintiffs' refusals to obey orders.

■■ We think there was sufficient evidence to impose liability on Butterworth, Scholes, and Saulnier for the transfers. Section 1983 is to be "read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed. 2d 492 (1961), *overruled on other grounds*, *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 663, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). When a person's conduct is a "substantial factor and a material element" in bringing about a foreseeable injury, he can be held liable for that injury. *Hilliard v. Williams*, 516 F.2d 1344, 1351 (6th Cir. 1975), *vacated on other grounds*, 424 U.S. 961, 96 S.Ct. 1453, 47 L.Ed.2d 729 (1976). *See* W. Prosser, *Law of Torts*, § 42, at 244–48 (4th ed. 1971). Here there was evidence from which the jury could infer that defendants made false reports and recommendations with the purpose or expectation that they would lead to segregated confinement, and that their actions caused Moore to advocate and Fitzpatrick to order the transfers.[11] This satisfied plaintiffs' burden of proving that it was more likely than not that defendants foresaw and helped bring about the transfers to segregation. *Hilliard v. Williams, supra*, at 1351. *See Spears v. Conlisk*, 440 F.Supp. 490, 498 (N.D.Ill.1977).

■ Fourth, and last, defendants assert that, even if they could be held responsible for the transfers, damages were not properly imposed on them for the conditions of confinement in segregation units. This argument stems from two premises: that the only right arguably violated by the transfers to segregation was the right of access to the courts, and that only nominal damages were due for any violation of this right because plaintiffs were able to secure counsel, file this lawsuit, and prevail. This argument, too, was not voiced below. We see no plain error in the award of damages for segregation. For the reasons stated above we are unconvinced that the only right defendants violated was plaintiffs' right of access to the courts. In any event, we think that damages for segregated confinement were appropriate to the extent that defendants attempted to punish or deter the exercise of that right. *Sostre v. McGinnis*, 442 F.2d 178, 189, 205 and n. 52 (2d Cir. 1971), *cert. denied sub nom. Oswald v. Sostre*, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972). *See Laaman v. Perrin*, *supra*, 435 F.Supp. at 326 and cases cited therein. The measure of such damages is clearly the difference between the harsher and, as to Sousa, deplorable conditions suffered in segregation and the conditions that prevailed in the general prison population. We find nothing shocking or even unreasonable as to the damages awarded for the confinement in segregation, $1,000 to Furtado and $9,000 to Sousa.

Having concluded our discussion of this phase of the case, we turn our attention to the evidentiary rulings attacked by defendants.

### EVIDENTIARY RULINGS

■ Defendants first challenge as unfairly prejudicial the introduction of evidence

---

11. Defendants complain that the jury never actually found that defendants' reports and recommendations actually caused the transfers. It is true that the interrogatories only called for the jury to determine whether the defendants intended or expected that segregated confinement would result. We do not think this entitles defendants to relief, however, because they never objected to the interrogatories or pointed out any deficiencies in them before they were submitted to the jury. In addition, we think it is highly likely that the jury believed defendants' actions caused the transfers, especially in light of evidence that Butterworth

specifically relied upon reports by Saulnier and Scholes in making his recommendation to Moore (who had only been on the job for two weeks) and that Moore mentioned the Saulnier and Scholes reports in his letters to Fitzpatrick, and in light of the trial judge's instruction that the plaintiffs had the burden of showing that the defendants "fooled" Moore. Although defendants claim at one point in their brief that the trial judge prevented them from proving that Moore's independent judgment regarding the transfers broke the chain of causation, we do not read the record this way.

concerning the conditions in segregated confinement, particularly as to Sousa's concededly "grotesque, horrifying and dramatic" testimony that he was locked up at DSU Bridgewater for virtually twenty-four hours a day for six months, in a cell that was located under a ward for violent, uncontrollable mental patients, that were saturated with excrement and urine, and that had no plumbing and almost no furnishings. This evidence was highly relevant to the theory of recovery already discussed and central to plaintiffs' proof of damages. The probative value of this evidence was substantially outweighed by the danger of unfair prejudice in admitting it. Fed.R. Evid. 403.

More persuasive is defendants' claim that the trial court erred in admitting an affidavit by Claude Cross, an attorney who was dead at the time of trial. In this affidavit, Cross stated that he went to see Sousa at Walpole on April 1, 1970, at the request of Dr. Miriam Van Waters, who had received a phone call on Sousa's behalf. Cross further stated that Sousa complained to him that letters he had written to Dr. Van Waters and Judge Wyzanski had been suppressed. Cross recalled asking Deputy Superintendent Butterworth about this and noted his response: "Butterworth replied that he had withheld one or two letters to Dr. Van Waters but had sent along the last one. He also said that he had refused to allow a petition to Judge Wyzanski to be mailed because allegations in it reflected badly upon the institution."

The Cross affidavit was very damaging to Butterworth's credibility. Butterworth had testified that he did not recall intercepting any of Sousa's letters, although he had then been forced to admit, when shown an affidavit he, himself, had executed in 1970, that he had returned the first letter to Van Waters and had asked Sousa to delete the name of an officer he implicated in brutality.

The Cross affidavit was not offered, however, merely to impeach Butterworth. Instead, it was offered under Rule 804(b)(5) of the Federal Rules of Evidence, as substantive evidence that Butterworth suppressed Sousa's mail. Rule 804(b)(5) creates an exception to the hearsay rule for an unavailable declarant's

> statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purpose of these rules and the interests of justice will best be served by admission of the statement into evidence.

The rule conditions the admissibility of the statement upon pretrial notice.

> However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

Defendants contend that the Cross affidavit was inadmissible under Rule 804(b)(5) because it was not trustworthy and because plaintiffs did not give the requisite pretrial notice that it would be offered. We are troubled by the trial judge's treatment of both of these issues.

In determining that the affidavit was sufficiently trustworthy, the trial judge relied heavily upon the fact that he knew Cross well, as a very honorable man. This approach was of questionable propriety, because the trial judge was not a witness and his knowledge of Cross was not subject to judicial notice. See Fed.R.Evid. 201; 603; 605. As to the lack of pretrial notice, the trial judge made no findings and demonstrated limited concern. He offered defense counsel a week's continuance to meet the Cross affidavit, but undercut the offer with a demand that counsel explain on the spot what he would be able to do with the time ("You can't dig up Mr. Cross").

Despite our reservations about the trial judge's handling of the Cross affidavit, we uphold its introduction under Rule 804(b)(5). There were many indicia of the affidavit's trustworthiness. Defense counsel himself conceded that its author was an "eminent attorney." As an attorney, Cross could not have failed to appreciate the significance of the oath he took in executing the affidavit and, as such, was not a person likely to make a cavalier accusation against a prison official. As he explained in his affidavit, he had successfully defended Dr. Van Waters before a special commission that investigated her removal as the superintendent of MCI Framingham. Although he went to see Sousa at the behest of Dr. Van Waters, Cross was basically a disinterested party; he was not Sousa's attorney and apparently had no connection with his lawsuit beyond submitting an affidavit.[12] Apart from these indications that the affiant was trustworthy, there were factors supporting the reliability of his statement that Butterworth admitted intercepting Sousa's mail to Dr. Van Waters and Judge Wyzanski. Cross, of course, had personal knowledge of Butterworth's admissions. As the trial judge noted in admitting the affidavit, Butterworth's own memory was poor, and his eventual admission on the witness stand that he brought one letter to Dr. Van Waters back to Sousa lent impressive support to the reliability of the Cross affidavit. All of this is not to say that Cross' recollection could not have been questioned, especially on the ground that his affidavit was executed nearly eight and one-half months after his conversation with Butterworth. Nevertheless, we think that there was a sufficient threshold showing of

trustworthiness and that, beyond this, it was for the jury to decide the weight to be given the affidavit. The defendants cite no cases that persuade us otherwise, and comparison of this case to cases from other circuits only confirms us in our view. *E. g., Copperweld Steel Co. v. Demag-Mannesmann-Bohler*, 578 F.2d 953, 964 (3d Cir. 1978); *United States v. West*, 574 F.2d 1131, 1134–36 (4th Cir. 1978); *United States v. Medico*, 557 F.2d 309, 315–17 (2d Cir.), *cert. denied*, 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 480 (1977); *United States v. Ward*, 552 F.2d 1080, 1082 (5th Cir.), *cert. denied*, 434 U.S. 850, 98 S.Ct. 161, 54 L.Ed.2d 119 (1977); *United States v. Carlson*, 547 F.2d 1346, 1354 (8th Cir. 1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977) (trustworthiness upheld). *Compare United States v. Bailey*, 581 F.2d 341, 348–50 (3d Cir. 1978); *United States v. Gonzalez*, 559 F.2d 1271, 1273–74 (5th Cir. 1977) (trustworthiness found lacking).

The failure of the plaintiffs to give pretrial notice that they would use the Cross affidavit also poses a serious problem. Just how strictly Rule 804(b)(5)'s pretrial notice provision should be enforced has been a matter of debate. After reviewing the legislative history of Rule 804(b)(5) and Rule 803(24), the identical provision for statements of available declarants, the Second Circuit concluded in two cases that Congress intended the pretrial notice provision to be rigidly enforced and that evidence proffered without pretrial notice must be excluded. *United States v. Ruffin*, 575 F.2d 346, 357–58 (2d Cir. 1978); *United States v. Oates*, 560 F.2d 45, 72–73 n.30 (2d Cir. 1977).[13] A leading commentator has

---

**12.** The evidence indicated that, after seeing Sousa and Butterworth, Cross called State Police Officer Reilly and then did nothing other than submitting his affidavit.

**13.** The legislative history of Rules 804(b)(5) and 803(24) can be summarized as follows. The House of Representatives deleted the forerunners of these residual hearsay provisions "as injecting too much uncertainty into the law of evidence and impairing the ability of practitioners to prepare for trial." H.R.Rep.No.650, 93d Cong., 1st Sess. 5–6 (1973), *reprinted in* [1974] U.S.Code Cong. & Admin.News, p. 7079.

The Senate reinstated the provisions in a narrower form, believing that "exceptional circumstances" would on rare occasions justify the admission of hearsay not covered by other exceptions, and stating its expectation that "the court will give the opposing party a full and adequate opportunity to contest the admissibility of any statement sought to be introduced . . . . ." S.Rep.No.1277, 93d Cong., 2d Sess. 18–20, *reprinted in* [1974] U.S.Code Cong. & Admin.News, p. 7051, 7065–66. The Conference Committee retained the provisions but added the pretrial notice requirement, without

criticized this view as unnecessarily restrictive, admonishing that Rule 102 of the Federal Rules of Evidence requires that the Rules "be interpreted with a sense of trial realities, not like a bond indenture." 4 *Weinstein's Evidence* ¶ 803(24)[01], at 803–243 n.4f (4th ed. Supp.1978).[14] Most courts have interpreted the pretrial notice requirement somewhat flexibly, in light of its express policy of providing a party with a fair opportunity to meet the proffered evidence. Thus, the failure to give pretrial notice has been excused if the proffering party was not at fault (because he could not have anticipated the need to use the evidence) and if the adverse party was deemed to have had sufficient opportunity to prepare for and contest the use of the evidence (for example, because he was offered a continuance, did not request a continuance, or had the statement in advance). *E. g., United States v. Bailey, supra,* 581 F.2d at 348; *United States v. Lyon,* 567 F.2d 777, 784 (8th Cir.), *cert. denied,* 435 U.S. 918, 98 S.Ct. 1476, 55 L.Ed.2d 510 (1977); *United States v. Medico, supra,* 557 F.2d at 316 n.7; *United States v. Carlson, supra,* 547 F.2d at 1355; *United States v. Leslie,* 542 F.2d 285, 291 (5th Cir. 1976); *United States v. Iaconetti,* 540 F.2d 574, 578 (2d Cir. 1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977).[15]

█ Even if we reject the Second Circuit's rigid interpretation of the pretrial notice requirement in favor of the prevailing flexible approach, the fly in the ointment in this case is that plaintiffs have never explained their failure to give pretrial notice. They cannot be presumed blameless. Nevertheless, on balance, we are persuaded that the lack of pretrial notice was not fatal.

Plaintiffs argue with some justification that defendants were not prejudiced by the failure to give notice because they were not, as they claim, surprised by the Cross affidavit. As plaintiffs point out, defendants had the Cross affidavit in their possession for seven and one-half years. It had accompanied plaintiffs' 1970 motion for injunctive relief, and Butterworth had specifically responded to it in his own affidavit (the one in which he admitted returning one of the letters to Van Waters). Furthermore, the second amended complaint alerted defendants that plaintiffs would make a major issue of Butterworth's suppression of Sousa's mail. But, most important, defense counsel's own comments indicated that he actually anticipated that evidence from Cross[16] would be offered; counsel said, "In inquiring into his background, I found he was a very eminent attorney."

We, therefore, find enough in the record to support an inference that counsel had prepared to meet the evidence in question, at least to the extent of investigating Cross' background, if not also to the point of reviewing prison mail records and contacting

---

elaborating on the reason for the requirement. Joint Explanatory Statement of the Committee on Conference, H.R.Rep.No.1597, 93d Cong., 2d Sess. 13, *reprinted in* [1974] U.S.Code Cong. & Admin.News:, pp. 7105–06. During the debates on the floor, two representatives who had participated in the conference commented upon the pretrial notice provision. Representative Hungate said of the notice requirement:

We met with opposition on that. There were amendments offered that would let them do this right on into trial. But we thought the requirement should stop prior to trial and they would have to give notice before the trial. That is how we sought to protect them. 120 Cong.Rec. H12,256 (daily ed. Dec. 18, 1974). Representative Dennis said that, although he disliked the residual hearsay provisions, he thought that the insertion of a notice requirement so that counsel could get ready for such evidence was an adequate compromise.

120 Cong.Rec. H12,256–57 (daily ed. December 18, 1974).

**14.** Rule 102 provides:

These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and the promotion of growth and development of the law of evidence to the end that truth may be ascertained and proceedings justly determined.

**15.** Although *Medico* and *Iaconetti* are Second Circuit cases, neither is mentioned in *Oates* or *Ruffin.*

**16.** Conceivably, defense counsel had not learned that Cross was dead and expected that his testimony would be offered rather than his affidavit, but we are not convinced this is material.

Judge Wyzanski's office.[17] Whatever deficiencies there were in defense counsel's preparation, such as a failure to review Butterworth's testimony about the affidavit with him in advance, we do not think they were fairly traceable to the failure to give pretrial notice. Finally, even if the court's offer of a continuance was somewhat abrupt, defense counsel showed little, if any, interest in that option, responding to the court's query that "it would make no difference" if he were given a continuance.

In these circumstances, we are not inclined to read the notice provision of Rule 804(b)(5) to have mandated the exclusion of the Cross affidavit. If, in upholding the affidavit's admission, we are reading the rule somewhat more liberally than other courts, we do so because, unlike the vast majority of cases interpreting the rule, this is a civil case.[18] Where there is no constitutional right of confrontation implicated by the rule, we think slightly freer play can be given to the discretion of the trial judge in admitting evidence under it. *See United States v. Bailey, supra,* 581 F.2d at 350–51; *United States v. Medico, supra,* 557 F.2d at 314 n.4. Nevertheless, we warn parties that they fail to give pretrial notice under the rule at their peril, and we expect trial judges to consider carefully statements offered under residual exceptions to the hearsay rule.

The remaining evidentiary issues can be handled with greater dispatch. The next contested ruling is the trial judge's exclusion of several of Furtado's prior convictions (for escape, assault and battery on a guard, contributing to the delinquency of a minor, carnal abuse of a child, and larceny of a motor vehicle) and his exclusion of the fact that the prior assault and battery conviction of plaintiff's witness Allen, who testified that Sousa had been beaten, was for assault and battery on a prison guard.

These convictions were offered under Rule 609(a) of the Federal Rules of Evidence, which provides:

> For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

Defendants contend that the trial judge had no discretion under Rule 609(a)(1) to exclude any of the prior convictions of plaintiff Furtado and witness Allen, since they were not defendants in the case. Plaintiffs' rejoinder is that the trial judge retained discretion under Rule 403 to exclude evidence on the ground that "its probative value is substantially outweighed by the danger of unfair prejudice." Although defendants may have a legitimate argument, we need not resolve the issue.

We think that whatever error there was in excluding some of Furtado's convictions and the precise nature of Allen's conviction for assault and battery was harmless, or, in the words of Rule 103(a) of the Federal Rules of Evidence, did not "affect a substantial right" of defendants.[19] The trial judge did admit five of Furtado's prior convictions (two for assault and battery, two for assault and battery with a dangerous weapon, and one for armed robbery) and three of Allen's convictions (for armed robbery while masked, burning a building, and assault and battery). Reference to an escape by Furtado was made in another witness' testimony. The jury could hardly

---

17. Indeed, we think any moderately prepared defense counsel in this case would have noticed Cross' affidavit and taken these steps.

18. We also have considered that the affidavit was admissible in any event to impeach Butterworth.

19. Rule 103(a) provides:
> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]

have forgotten that the case arose in a prison setting and that virtually every one of plaintiffs' witnesses was a convict. Moreover, the excluded convictions were not particularly probative of credibility.[20] In these circumstances, we think it somewhat strained for defendants to argue that their attack on Furtado's or Allen's credibility was significantly impaired, and we find no error warranting a new trial. *Compare United States v. Dixon*, 547 F.2d 1079, 1084 (9th Cir. 1976).[21]

Next defendants claim error in the admission of two memoranda written in 1971 by plaintiffs' witness Rosemary Adamo. Adamo was then a law student assisting plaintiffs' counsel. In that capacity, she twice interviewed an inmate named Thomas Murray, who told her that he had seen guards beat Furtado. Her memoranda of their conversations were admitted into evidence after Murray testified for defendants that he did not see Furtado beaten and had not spoken to Adamo about the incident.

Defendants do not deny that the Adamo memoranda qualified as recorded recollections under Rule 803(5) of the Federal Rules of Evidence, or that they were admissible to the extent that they contradicted Murray's testimony. Nevertheless, they assert that the court should at least have excised three prejudicial portions of the memoranda that were not inconsistent with Murray's testimony:

In 1967 [Murray was] indicted for conspiracy and accessory for murder of an inmate. Never prosecuted but prison officials still use this as a threat.

Moore called Murray to his office and told him he wanted to press charges against the officers involved, which Murray didn't believe.

He wouldn't give any names [of prison officers to the state police] though, or discuss it, because he was afraid of reprisal. He told them he didn't want to be found dead after "jumping off the third tier."

These portions of the memoranda were not highlighted as they were read to the jury, and the memoranda themselves were not made exhibits. Assuming *arguendo* that certain portions of the memoranda were inadmissible hearsay and were potentially prejudicial because they put prison officials in a bad light, defendants were adequately protected by the trial judge's contemporaneous cautionary instructions to the jury.[22]

Finally, defendants take issue with the trial judge's refusal to allow State Police Officer Philip Reilly to testify in rebuttal that Murray told him, two days after the incident, that he was being pressured by several inmates to say the guards were cruel and unreasonably abusive to Furtado. This evidence was offered prior to Adamo's testimony and excluded as premature, but,

---

**20.** Defendants contend that Furtado's convictions for contributing to the delinquency of a minor, carnal abuse of a female child, escape, and larceny of a motor vehicle suggested "devious or deceitful conduct" on his part. Even if this can fairly be said of the latter two convictions, a point of which we are not persuaded, the escape was mentioned anyway and, as we read the record, the trial judge never made a definitive ruling on the escape and larceny of a motor vehicle conviction.

**21.** We need not decide whether defense counsel failed to preserve objections to the exclusion of the prior convictions. It would have been better had counsel made it clear, after the *voir dire* on this point, that he was pressing an objection, as was required in *Subzec v. Curtis*, 483 F.2d 263, 266 (1st Cir. 1973).

**22.** The judge, in part, told the jury:

The only purpose of hearing what this young lady will tell you that Mr. Murray told her is for you to decide whether or not Mr. Murray was telling you the truth when he testified. If you find as a result of what she tells you that he was not telling the truth, then all of those, as to those particular matters, then all of those things go out of the case so far as Mr. Murray is concerned. And your mind remains a blank just as if he had never testified. You cannot use this contradiction, what the law calls impeachment, affirmatively in the case anymore. It's only with relation to whether or not you believe Mr. Murray.

The instructions make it unnecessary for us to discuss plaintiffs' contention that defendants failed to preserve this evidentiary point for appeal by specifying or moving to strike the offending portions of the memoranda.

without waiving objections to its admissibility, plaintiffs stipulated that the evidence could be offered, without recalling Reilly, after Adamo testified. Nevertheless, defense counsel forgot to offer it before he rested. It was within the trial judge's discretion to deny a motion to reopen the case on the following morning on the ground that to admit the evidence in splendid isolation would give it undue emphasis. *Ditter v. Yellow Cab Co.*, 221 F.2d 894, 899 (7th Cir. 1955). *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).[23]

### THE JURY INSTRUCTIONS

 Defendants challenge the trial court's instructions to the jury on two of the three aspects of the case: (1) the use of excessive force, and (2) the suppression of Sousa's mail.[24] Because defendants did not object to the instructions before the jury retired, as required by Rule 51 of the Federal Rules of Civil Procedure, we have only to decide whether the instructions given were plainly erroneous and necessitate reversal to prevent a clear miscarriage of justice. *Morris v. Travisono, supra*, 528 F.2d at 859; *Nimrod v. Sylvester*, 369 F.2d 870, 873 (1st Cir. 1966).[25]

On the claim of brutality, the trial judge impressed upon the jury that the issue was whether defendants had used unreasonable or excessive force. Quoting at length from Judge Friendly's opinion in *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom. John v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973), he imposed a rather heavy burden on plaintiffs to establish the force used was unreasonable:

By unreasonable force, I do not mean that you should draw fine, exact lines. A prison is not a social gathering. A wise judge has put it:

"The management by a few guards of large numbers of prisoners, not usually the most gentle or tractable of men and women, may require and justify the occasional use of a degree of intentional force. Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights. In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm."

It would not be practical; it would hamstring a prison guard from using force at all when force was required if he had to fear a law suit every time. The law is not like that. I instruct you that the plaintiffs must show you that a guard used excessive force, excessive to the degree that a reasonable guard would realize, on the facts known to him when he did it, that it was excessive.

Although the standard for determining when a guard's application of force offends the eighth or fourteenth amendments is not easily formulated, the charge given here is perhaps open to criticism on the ground that it did not expressly require a finding that the force used was shocking or violative of universal standards of decency.[26]

---

**23.** As the plaintiffs point out, the fact that Murray had told the state police he was under pressure from other inmates was mentioned in the Adamo memoranda.

He said the statements in the police report about the fact he saw the officers use reasonable force to restrain and that he was being pressured by other inmates are false.

**24.** Defendants make no complaints about the charge on the transfers to segregation.

**25.** *Krock v. Electric Motor and Repair Co.*, 327 F.2d 213 (1st Cir.), *cert. denied*, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964), relied on by defendants, is not to the contrary. That case did not involve an attack on the judge's charge on appeal.

**26.** To the contrary, the court indicated that punitive damages could be imposed if the jury found the conduct shocking or outrageous; the jury awarded no punitive damages for the beatings.

See *Meredith v. State of Arizona*, 523 F.2d 481, 482–84 (9th Cir. 1975); *Johnson v. Glick, supra*, 481 F.2d at 1033; *Howell v. Cataldi*, 464 F.2d 272, 282 (3d Cir. 1972). Nevertheless, we do not think the charge is any wider of the mark than the one in *Morris v. Travisono, supra*, 528 F.2d at 858, where we declined to invoke the plain error exception to Rule 51.[27] Nor are we impelled to find a clear miscarriage of justice, particularly in light of ample evidence that Furtado suffered a cracked jaw, bled profusely, and required hospitalization and pain medication for several days.

We come to a similar conclusion after examining the court's instructions on the suppression of Sousa's mail. In essence, the court charged that Butterworth was liable for damages if he suppressed the second letter Sousa wrote to Dr. Van Waters and the letter Sousa wrote to Judge Wyzanski. The defendants claim the instruction was erroneous because it deprived Butterworth of his qualified immunity defense, by failing to take into account that the law concerning prisoners' correspondence rights was unsettled in March, 1970, and by failing to require a finding of malice.

Although we agree that Butterworth could assert qualified immunity unless he knew or should have known he was violating Sousa's rights, *Procunier v. Navarette*, 434 U.S. 555, 562, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), and that the rights of prisoners to send routine correspondence were unclear until 1974, *Procunier v. Martinez*, 416 U.S. 396, 406–07, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), we find no plain, reversible error in the instruction given. In the first place, we are not convinced an instruction on qualified immunity was required. In testifying, Butterworth did not rely on this defense, but rather denied intercepting the letters in question. Second, a strong argument can

be made that Butterworth should have known that intercepting these letters would violate Sousa's right of access to the courts. Both letters contained requests for legal assistance, and one was directed to a federal judge. By 1970, it was well settled that a prisoner's right of access to the courts included the right to mail legal petitions to court without having prison officials screen them, *Ex parte Hull*, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941), and the rights of access to legal assistance, *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). *See Nolan v. Scafati*, 430 F.2d 548, 550–51 (1st Cir. 1970) (holding, four months after Sousa wrote his letters, that *Johnson v. Avery* clearly meant an inmate had the right to write to the Civil Liberties Union for legal assistance). *Compare Procunier v. Navarette, supra*, 434 U.S. at 565 n.12, 98 S.Ct. 855. Finally, because the jury expressly found that Butterworth recommended segregation for Sousa because of his letter writing and assessed punitive damages, it is highly unlikely that a charge requiring it to find Butterworth acted maliciously would have made any difference.

## PREJUDGMENT INTEREST AND ATTORNEY'S FEES

We now consider whether prejudgment interest was properly assessed and attorney's fees were correctly computed. To the award of $27,500 in damages, the trial judge added approximately $14,900 in prejudgment interest, a sizeable amount that reflected this case's slow progress to trial. The trial judge's reason for adding prejudgment interest is not stated in the record. From the calculations made, however, it appears that he believed Massachusetts law controlled this point and that the pertinent statute, Mass.Gen.Laws ch. 231, § 6B, mandated prejudgment interest.[28]

---

27. In *Morris*, an instruction that the jury could impose liability if it found that prison guards used tear gas against nonthreatening prisoner's "for the mere purpose of punishing them" was said to lower the threshold of cruel and unusual punishment.

28. Chapter 231, § 6B provides:
 In any action in which a verdict is rendered or a finding made or an order for judgment made for pecuniary damages for personal injuries to the plaintiff or for consequential damages, or for damage to property, there shall be added . . . to the amount of

■ We first decide whether Massachusetts law was applicable. Although state law governs the imposition of prejudgment interest in diversity cases, *Hobart v. O'Brien*, 243 F.2d 735, 745 (1st Cir. 1957), it has not been applied in cases arising under federal law. *Sanabria v. International Longshoremen's Association Local 1575*, 597 F.2d 312, 313–14 (1st Cir. 1979); *Moore-McCormack Lines, Inc. v. Amirault*, 202 F.2d 893, 894–97 (1st Cir. 1953). In civil rights cases brought under 42 U.S.C. § 1983, courts are required by 42 U.S.C. § 1988 to look first to federal law on all matters, but to turn to the law of the forum state if federal law does not cover the issue.

> The jurisdiction . . . conferred on the district courts by the provisions of this chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction . . . is held, so far as the same is not inconsistent with the Constitution and laws of the United States shall . . . govern[.]

42 U.S.C. § 1988. Whether state prejudgment interest law applies in this case therefore hinges on whether federal law on the subject is viewed as "deficient." *See Robertson v. Wegmann*, 436 U.S. 584, 588, 98 S.Ct. 1991 (1978).

■ We rule that resort to state law on prejudgment interest was not required. Although we have found no cases on point, several Supreme Court opinions are instructive. On one hand, the Court has applied state survivorship law and statutes of limitations in federal civil rights litigation. *Id.* at 594–95, 98 S.Ct. 1991; *Johnson v. Railway Express Agency*, 421 U.S. 454, 462–66, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). On the other hand, the Court has indicated that federal courts should fashion appropriate rules for damages in section 1983 actions. *Carey v. Piphus*, 435 U.S. 247, 257–59, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). *See Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 238–40, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). We think that the issue of prejudgment interest is closely allied with that of damages, and that a federal rule should, therefore, be developed for an action under 42 U.S.C. § 1983. This is altogether in keeping with the approach to prejudgment interest in *Rodgers v. United States*, 332 U.S. 371, 373, 68 S.Ct. 5, 7, 92 L.Ed. 3 (1947), where, in barring prejudgment interest on penalties exacted under the Agricultural Adjustment Act, the Supreme Court said, "in the absence of an unequivocal prohibition of [prejudgment] interest . . ., this Court has fashioned rules which granted or denied interest on particular statutory obligations by an appraisal of the congressional purpose in imposing them and in light of general principles deemed relevant."

Declaring that a federal rule should govern prejudgment interest in civil rights actions under 42 U.S.C. § 1983 is easier than formulating a rule. There are, of course, three options: prejudgment interest could be (1) mandatory, (2) discretionary, or (3) barred. We find little to recommend a mandatory rule. The injuries suffered by plaintiffs in civil rights actions are often intangible, and prejudgment interest will not always be necessary to compensate them fully. *See Moore-McCormack Lines, Inc. v. Amirault, supra*, 202 F.2d at 895. Assuming that prejudgment interest can also legitimately have a punitive purpose when a defendant has obstinately delayed payment to an injured party, *see Rivera v.*

---

damages interest thereon from the date of commencement of the action.

. Effective August 14, 1974, the rate of prejudgment interest was increased from 6% to 8%.

1974 Mass.Acts, ch. 224, § 1. The trial judge accordingly provided for interest at 6% prior to August 14, 1974, and 8% thereafter.

■

*Rederi A/B Nordstjernan*, 456 F.2d 970, 976 (1st Cir.), *cert. denied*, 409 U.S. 876, 93 S.Ct. 124, 34 L.Ed.2d 128 (1972), such interest will not be warranted in every case. By the same token, we have reservations about an inflexible rule barring prejudgment interest in a section 1983 action. Such a rule is arguably appropriate because section 1983 creates a species of tort liability, and prejudgment interest on the typical unliquidated tort claim was not recoverable at common law. *Id.* at 976; *Moore-McCormack Lines, Inc. v. Amirault, supra*, at 897. Nevertheless, the traditional common law view has been criticized, *see id.* at 898; D. Dobbs, *The Law of Remedies* § 3.5, at 173–74 (1st ed. 1973), and common law tort rules, although a useful starting point for fashioning remedies for section 1983 violations, are not binding. *Carey v. Piphus, supra*, 435 U.S. at 258–59, 98 S.Ct. 1042.

■ We need not decide between a rule making prejudgment interest discretionary and one barring it altogether. Assuming *arguendo* that prejudgment interest was discretionary, federal law dictated that the jury should decide whether to assess it. *Robinson v. Pocahontas, Inc.*, 477 F.2d 1048, 1053 (1st Cir. 1973); *Newburgh Land & Dock Co. v. Texas Co.*, 227 F.2d 732, 735 (2d Cir. 1955); *Parisi v. Lady in Blue, Inc.*, 433 F.Supp. 681, 682–83 (D.Mass.1977). But the question of prejudgment interest was not submitted to the jury, nor did plaintiffs ask that the jury be instructed on it. Consequently, the award of prejudgment interest must be stricken. *Robinson v. Pocahontas, Inc., supra*, at 1053.[29]

■ There remains the question of attorney's fees, which were awarded to plaintiffs' two lawyers under 42 U.S.C. § 1988. The trial judge awarded $13,750, a figure arrived at by halving plaintiff's dollar recovery. In settling upon this novel formula, the court took the position that it would be unfair to make defendants pay more than plaintiffs would have paid counsel had they been able to retain counsel on a contingency basis. Aware that this approach might be rejected on appeal, the court made an alternative finding that "counsel legitimately put $20,000 worth of work into the case, timewise."

We are constrained to remand. Although the half the dollar recovery formula has beguiling simplicity and resulted in a substantial award here, we cannot accept it. Quite apart from the fact that the formula would work obvious injustice in cases where damages were nominal or only injunctive relief was sought, or in cases where recovery was large and out of proportion to the work done, we eschewed such simple formulae in *King v. Greenblatt*, 560 F.2d 1024 (1st Cir. 1977), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978). There, we held that in awarding fees the court must "adhere carefully" to the twelve criteria that were set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), and approved by Congress. Because the fifty per cent of recovery formula ignores time and labor spent, as well as other factors, it cannot stand.

Nor are we sure that the alternative award of $20,000 reflects consideration of each of the pertinent criteria. True, plaintiffs' counsel directed the court's attention to *King v. Greenblatt, supra*, and provided relevant documentation, and the court touched upon some of the proper criteria in its opinion (for example, stating that the representation given was highly qualified). But, because the trial judge found that counsel put $20,000 worth of work into the case "timewise," we are left to wonder whether this figure only reflects the hours spent.

Accordingly, we remand the case for further consideration of the attorney's fees. Upon remand, the district court should also determine, after appropriate documentation is submitted, what attorney's fees are due plaintiffs' counsel for the appellate work that has now been put into the case.

---

**29.** We do not think Rule 49(a) of the Federal Rules of Civil Procedure is to the contrary. That rule provides that, when a jury is asked to return a special verdict, the court may decide any issue of fact not presented to the jury.

To sum up, the portion of the judgment imposing prejudgment interest is stricken and the portion of the judgment relating to attorney's fees is vacated and remanded for further consideration. In all other respects, the judgment of the district court is upheld.

SO ORDERED.