**Lucille Ann Shanks SMITH**

v.

**Sergeant Martha THOMAS, Major Lyndalyn Campbell, Ethel Hungerford, R. N., and Helen Corrothers, Superintendent, Women's Unit, Arkansas Department of Correction.**

No. PB–C–77–103.

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

Sept. 7, 1979.

Dennis L. James, Southern, Matthews & James, Little Rock, Ark., for petitioner.

Catherine Anderson, Deputy Atty. Gen., Little Rock, Ark., for defendants.

Robert A. Newcomb, Little Rock, Ark., for Lyndalyn Campbell.

## MEMORANDUM OPINION

ROY, District Judge.

Lucille Ann Shanks Smith, the petitioner herein, alleges a violation of 42 U.S.C. § 1983 arising out of an altercation which she had with certain officials and employees of the Women's Unit of the Arkansas Department of Correction at Pine Bluff, Arkansas. Plaintiff Smith is an inmate at the Women's Unit and the occurrence took place on November 5, 1976. The allegations of the petitioner are that she was struck with a slapper several times by the defendants, Major Lyndalyn Campbell and Sergeant Martha Thomas, from which she received serious injuries; that nurse Ethel Hungerford did not give her adequate medical attention; that Ms. Hungerford stood by while the other defendants were using excessive force on plaintiff. Ms. Helen Corrothers, Superintendent of the Women's Unit, Arkansas Department of Correction, was also named as a defendant—primarily because of her position with the Institution. After the trial the court granted a motion to dismiss as to Helen Corrothers since the evidence reflected Ms. Corrothers had no active part in the occurrence, did not encourage it, nor have any knowledge of the alleged incident until after it was over. There was no objection by plaintiff to the court's dismissal of Helen Corrothers as a party and no mention is made of it in plaintiff's brief.

The case was tried to the court and plaintiff was represented by employed counsel. At the time of trial counsel requested that the court grant a continuance but the court found no good cause was shown for the continuance. Nevertheless, in order to afford the plaintiff every opportunity to present all possible evidence in her favor, the court allowed the record to remain open for thirty days after trial so that the plaintiff would have the opportunity to present additional evidence. However, the plaintiff did not avail herself of this opportunity and no additional evidence was offered. Both the plaintiff and the defendants have filed their respective briefs to which the court has given careful consideration.

The plaintiff is presently serving a life sentence for the murder of a policeman, six counts of kidnapping, and one count of robbery. At trial she also admitted having a record of escapes from prisons in Kentucky and was an escapee at the time the Arkansas policeman was killed. She had attempted to escape from the Arkansas prison on at least two occasions and had managed to secure some knives which she used in one of the attempts.

The Superintendent of the Women's Unit, Ms. Corrothers, testified that plaintiff had received approximately twelve major disciplinary rebukes which had been placed in her file since she was institutionalized in 1974. Both Ms. Corrothers and A. L. Lockhart, Assistant Director of the Arkansas Department of Correction, testified that plaintiff was a high security risk and it was necessary to keep her separated from inmates Brenda Spencer and Essie Mae Willock as they too were involved in the escape from the Kentucky prison and also in the shooting of the Arkansas Policeman. On this issue Major Campbell testified:

> We were advised to always take extreme caution in dealing with inmate Smith due to a previous escape—a successful escape attempt—in Kentucky. Additionally, during our location at the Cummins Unit inmate Smith and another inmate had attempted to escape twice there, one escape having involved the use of knives as possible weapons. Therefore, we always used extreme caution any time we dealt with her.

The defendants testified that plaintiff had been placed in mini-max so that she would be separated from inmate Spencer who was in maximum security. Plaintiff indicated her displeasure at not being moved to maximum security with profanity and verbal abuse of the guards. When this was not effective, she practically demolished her cell. The defendants introduced exhibits 1 through 9 which graphically portray the destruction of the room. The ceiling had been pulled down; metal strips broken up; bedcovering strewn on the floor; a pitcher of water hurled on the

floor; and the water and lighting fixtures destroyed. After plaintiff had pulled the ceiling down in her room, she complained loudly of being cold and stated that she needed water and using profanity, she screamed that if she did not get heat in the room she would demolish it further.[1] Since ·the lighting fixture had been destroyed, Major Campbell attempted "to look through the glass window to see what had been done but because of the lack of light, she could not ascertain the damage."

·The plaintiff's hospital records were introduced through Mr. James Neff, Director of Medical Records at Jefferson County Hospital at Pine Bluff. They indicated plaintiff was hospitalized overnight and returned to her unit at the institution the next day—apparently without serious injury.

Sharon Nicholson, shift supervisor at the Women's Unit, testified at length concerning the disturbance created in the library on November 4th when plaintiff demanded to see certain officials of the Unit. It was explained she could not see them at this time and she broke and ran toward the office area. Plaintiff had to be physically restrained and put back in her unit.

On November 5, 1976 Major Campbell and Ms. Nicholson, after securing a flashlight, went into the room and as soon as they entered plaintiff, who had been sitting on her bed, jumped up and began hitting, kicking and pulling the hair of Major Campbell. It was Ms. Nicholson's testimony that she thought Major Campbell hit the plaintiff with a slapper one time; that Major Campbell was thrown down by the plaintiff and that she assisted in trying to remove the plaintiff from Major Campbell. At this time she testified that Major Campbell was bleeding on the right side of her face and one of her legs was bleeding; also that plaintiff again in a loud demanding way insisted that she bè moved to maximum security.

Major Campbell testified that she is a housewife and mother; that she has B.A.

and M.A. degrees in Sociology from Stephen Austin University in Texas; that she went to work for the Arkansas Department of Correction in 1973 and previously taught Sociology at Arkansas State University in Jonesboro. The court was impressed with Major Campbell's demeanor on the witness stand and her apparent sincerity throughout her testimony. She is 5'1" and weighs 103 pounds. Her testimony was that she went to view the damage to the cell after she had received a call advising her about the destruction in plaintiff's cell. She took a slapper with her because it had been reported to her that inmate Smith had said she was going to tear the "whole goddamned place apart". As she entered inmate Smith was sitting on her bunk in her room and when Major Campbell opened the door, she said: "You M.F., I told you if you didn't get something done about this heat I was going to tear the whole place apart. You accused me of doing it yesterday, but I have shown you I have done it today." The testimony reflected that plaintiff was swinging both hands and hit Major Campbell on the right forehead; knocked her down on the bed and hit her head up and down on the wash basin, dislodging the Major's contacts so she could not see. After the initial encounter Major Campbell had dropped her slapper and she reached for it and struck plaintiff only enough to cause her to stop pulling her hair and beating her head against the wash basin. Major Campbell testified that the side of her face was cut, one leg was bleeding, and she had bruises, red marks and knots on her head from the hair pulling. She was given a tetanus shot and treated for these injuries.

The plaintiff testified that she was calmly sitting on her bed when Major Campbell rushed in the unit and started hitting her with the slapper. She stated that after the violent episode in the unit, she was drug into the bathroom and beaten further there. However, it was the testimony of Major Campbell and several other witnesses that no further use of force occurred in the

1. The record reflected the temperature in the building was controlled by a general thermostat

and the same amount of heat was coming into plaintiff's unit as all the other units.

bathroom. Major Campbell testified that the incident lasted approximately 3 minutes until plaintiff was subdued and handcuffed, after which there was no further violence. The inmate was then transported by her and Sergeant Thomas to the hospital within 30 minutes after the incident. Major Campbell testified that at no time did she hit the plaintiff after she was handcuffed. On cross-examination when asked why she used the slapper on petitioner, Major Campbell replied: "She attacked me and I defended myself."

Nurse Hungerford, hospital administrator, is a registered nurse and had previously been employed by the Jefferson County Hospital as head nurse on the surgical floor. She came to the bathroom and checked the inmate after the episode and found no bruises or open wounds, but recommended that the inmate be taken to the hospital for a skull series. The nurse's notes regarding treatment of the inmate on November 5, 1976 indicated that she was conscious, no cuts or abrasions, skull series was negative, complained of nausea and of being cold. The room was checked and the temperature was 80 degrees Fahrenheit. Nurse Hungerford did not see anyone hit inmate Smith. The nurse testified that she did not want the petitioner to walk until she had the hospital tests and had her carried on a cot from the bathroom to the station wagon for the trip to the hospital. The move was initially made from the cell, which had no light, to the bathroom so nurse Hungerford could determine the extent of any injuries to the plaintiff.

Concerning the issue of rendering prompt medical attention, Major Campbell testified:

Q From the time that this incident concluded to the time that Nurse Hungerford arrived, approximately how long was that?

A I would say three minutes.

Q And from the time the incident concluded to the time that you arrived at that emergency room at the Jefferson County Hospital with the plaintiff, approximately how long was that?

A I would say no more than 30 minutes.

Both Ms. Corrothers and A. L. Lockhart testified that the guards were taught how to use slappers and when to use them; that they were never to use excessive force and that they were only to be used in extreme emergencies. Mr. Lockhart testified that they had been trained in the use of the slappers and they were only to use them to prevent escape, harm to guards, or inmates, and then they were to use the force necessary to subdue.

Major Campbell testified:

I had received training by Arkansas State Police troopers in training sessions and we had always been told that any time that we anticipated any form of violence, rather than to use our hands on an inmate, that we should use a slapper to defend ourselves.

The court finds the testimony of the defendants to be credible and that plaintiff's testimony lacks credibility due to her numerous felony convictions, her propensity for violence and demeanor on the witness stand. The court finds that the plaintiff was struck by Major Campbell in self-defense and that she used only such force as necessary to stop the attack and plaintiff was not struck in the bathroom at the Women's Unit prior to being transported to the Jefferson County Hospital. The court also finds that the plaintiff was promptly transported to the Jefferson County Hospital where she received adequate medical treatment during her overnight stay there; and from Nurse Hungerford prior to the trip to the hospital and on her return to the Unit.

In the case of *Jones v. Wolfson*, No. 78 Civ. 2803 (S.D.N.Y., May 31, 1979), the court held:

It is the law that "prison authorities may use reasonable force on prisoners when administering prison regulations," *Argentine v. McGinnis*, 311 F.Supp. 134, 138 (S.D.N.Y.1969), and absent a claim of unreasonableness or serious physical injury there is no deprivation of civil rights cognizable under section 1983. Likewise, ex-

cept in instances where a state prisoner is totally deprived of essential medical care, the federal court will not interfere with internal prison administration of medical services. *Church v. Hegstrom,* 416 F.2d 449 (2d Cir. 1969).

The court finds no merit in plaintiff's contention that she should not have been returned to her former cell in mini-max. It was necessary for security purposes that plaintiff be housed away from certain inmates with whom she had previously associated in her criminal activities.

In *Finney v. Hutto,* 410 F.Supp. 251, 271 (E.D.Ark.1976), *aff'd* 548 F.2d 740 (8th Cir. 1977), *aff'd* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), the district court stated:

> It should always be kept in mind that the reasonable use of force by prison authorities is not only permissible but positively required on occasions. Hence, every incident of violence involving an inmate and a prison employee is not necessarily an incident of brutality.

Further guidelines were given the court concerning the action of prison officials when an incident similar to this occurred in *Jackson v. Allen,* 376 F.Supp. 1393, 1396 (E.D.Ark.1974). This case states that the test to be applied is: ". . . was the force used reasonable and necessary *under the facts and circumstances of the particular case?*" [emphasis in original]

The court finds that the force used by Major Campbell was necessary due to the plaintiff's propensity for violence, previous escape record, and attack upon the Major. In *Jackson v. Allen, supra,* the court held that:

> . . . in a case where there is any imminent threat to persons or property, or where there is an overt challenge to authority which, if not met promptly and directly, could undermine the continuation of necessary prison discipline, then, of course, prompt, forceful, offensive action will usually be warranted, and, even if it results in serious injury, such force may well be found to be reasonable and necessary (and not 'excessive') *under those circumstances* and, therefore, not a

legal basis for the award of damages for the resulting injuries.

376 F.Supp. at 1397.

As to plaintiff's contention that she was denied medical attention, we look to *Estelle v. Gamble,* 429 U.S. 97, 105, 97 S.Ct. 285, 50 L.Ed.2d 251, 260 (1976), which states the test is whether there has been "deliberate indifference to a prisoner's serious illness or injury . . . ." We find "no indifference" to plaintiff's injuries here.

Concerning claims of medical mistreatment under 42 U.S.C. § 1983, the court also stated in *Estelle, supra* :

> . . . a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference of serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

429 U.S. at 106, 97 S.Ct. at 292.

In *Furtado v. Bishop,* Nos. 78–1482, 78–1483, 604 F.2d 80 (1st Cir. 1979, July 26, 1979) the court cited with approval *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973), cert. denied 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973) and *Meredith v. State of Arizona,* 523 F.2d 481, 482–84 (9th Cir. 1975). In *Furtado* the court held that for a plaintiff to prevail in an action alleging the use of excessive force by prison authorities, the evidence must show the force used was "shocking or violative of universal standards of decency." All of these cases indicate a heavy burden of proof is placed upon a plaintiff attempting to prove the amount of force used was unreasonable or excessive.

The United States Supreme Court has pointed out that "central to all other corrections goals is the institutional consideration

of internal security within the corrections facilities themselves." *Pell v. Procunier*, 417 U.S. 817, 823, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Since security is a paramount reason for actions of prison officials, the court concludes it was necessary to place the plaintiff back in the cell she originally came from to keep her separated from certain other inmates with whom she had participated in escapes and escape attempts from the Kentucky Women's Prison and the Arkansas prison system.

> Prison life, and relations between the inmates themselves and between the inmates and prison officials or staff, contain the ever-present potential for violent confrontation and conflagration. *Wolff v. McDonnel*, 418 U.S. [539] at 561–62, 94 S.Ct. 2963, 41 L.Ed.2d 935. Responsible prison officials must be permitted to take reasonable steps to forestall such a threat, and they must be permitted to act before the time when they can compile a dossier on the eve of a riot.

*Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 132–33, 97 S.Ct. 2532, 2542, 53 L.Ed.2d 629, 643 (1977).

In light of the foregoing authorities, the court finds that the complaint of the plaintiff is without merit and an order to this effect will be entered by the Clerk.