Patrick BELL, Sr., Special Administrator of the Estate of Daniel Bell, Deceased, and Special Administrator of the Estate of Dolphus Bell, a/k/a Dock Bell, Deceased, and in his own behalf, Alfonzo Bell, Doffer Bell, Eddie Bell, Ernest Bell, Henry Bell, Jimmy Bell, Joseph Bell, Lawrence Bell, Roosevelt Bell, Silvia White Bell, and Walter Bell, Plaintiffs,

v.

CITY OF MILWAUKEE, Thomas Grady, Jr., Howard Johnson, and Edwin Shaffer, Defendants.

Civ. A. No. 79–C–927.

United States District Court, E. D. Wisconsin.

March 30, 1982.

See also D.C., 498 F.Supp. 1339 and D.C., 514 F.Supp. 1363.

Thomas Jacobson, Jerome Krings, Curry First and Walter F. Kelly, Milwaukee, Wis., for plaintiffs.

Rudolph M. Konrad, Asst. City Atty., Milwaukee, Wis., for defendants City of Milwaukee, Howard Johnson and Edwin Shaffer.

Franklyn M. Gimbel, Milwaukee, Wis., for defendant Thomas Grady, Jr.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

On December 16, 1981, the jury returned the special verdict submitted to them in this

case. Subsequently, this Court ordered the parties to submit proposed forms of judgment and to submit any motions the parties thought the Court should consider in making its judgment. This decision and order decides these motions and sets forth a final judgment.

This decision discusses seriatim the following issues raised by the motions and proposed judgments:

1. Does the 1961 settlement in *Bell v. Grady and The City of Milwaukee*, No. 286,-538 (Milwaukee County Circuit Court 1959), bar this action?

2. Is this action barred by the statute of limitations or by the doctrine of laches?

3. Did any cause of action that Daniel Bell had under the civil rights laws survive his death to the benefit of his estate?

4. Did any cause of action under the civil rights laws arising out of the death of Daniel Bell or the subsequent conspiracy survive the death of Dolphus Bell?

5. Do the brothers and sister of Daniel Bell have a cause of action for the loss of society and companionship of Daniel Bell?

6. Do the brothers and sister of Daniel Bell or the Estate of Dolphus Bell have a cause of action under the civil rights laws arising out of the conspiracy to cover up the true facts of the shooting of Daniel Bell?

7. Is 42 U.S.C. § 1985(2) the exclusive remedy under the civil rights laws for this conspiracy?

8. Do the damage limitations of the Wisconsin wrongful death statute apply to the recovery in this case?

9. Did the plaintiffs fail to join indispensable parties, and may the plaintiffs now amend their complaint to add as defendants the Estates of Leo Woelfel, Rudolph Glaser, and William McCauley?

10. Are the plaintiffs entitled to a new trial as to the issue of punitive damages against Milwaukee County and the Office of the Milwaukee County District Attorney?

11. Is the City of Milwaukee liable for any compensatory or punitive damages under any theory of the federal civil rights law put forth by the plaintiffs?

12. Is the City of Milwaukee liable for any compensatory or punitive damages assessed against its employees under Wisconsin's indemnification statute, Wis.Stats. § 895.46?

13. Are the plaintiffs entitled to prejudgment interest on the damages?

Most of these issues are not new.

## 1. EFFECT OF THE 1961 SETTLEMENT

The defendants claim that the 1961 settlement and subsequent dismissal order in *Bell v. Grady and The City of Milwaukee*, No. 286,538 (Milwaukee County Circuit Court 1959) bar this action. This would bar only the claims of the Estate of Dolphus Bell against defendants Grady and the City of Milwaukee for the death of Daniel Bell. It would not bar the claims of the other plaintiffs, nor would it bar the conspiracy claim of Dolphus Bell's Estate. The defendants raised this issue on a motion for summary judgment which the Court decided in its decision and order of June 4, 1981, at 7–9. 514 F.Supp. 1363, D.C.Wis. The facts surrounding the 1959 suit and subsequent settlement are set forth in that decision and order at 4–6. The Court there held that the 1959 suit and settlement would not be a bar to this action if the allegations of fraud, concealment, and a broad-based cover up by the defendants were proven.

The plaintiffs have requested that this Court reconsider its finding made in the decision and order of June 4, 1981, at 8, that Dock Bell entered into a binding settlement agreement with defendants Grady and the City of Milwaukee. This finding was made under Rule 56(d) of the Federal Rules of Civil Procedure, on the state of the record at that time, as a fact existing without substantial controversy. While Dock Bell never signed any settlement agreement or accepted payment, this Court held that the agreement was effective since it was entered into on the record in open court.

■ Plaintiffs now seek to prove the contrary. They have moved for an evidentiary

hearing and have offered an affidavit of Silvia Bell, filed January 15, 1982, wherein she states in paragraph 9 that Dock Bell "never could have or would have agreed" to the settlement. This appears to be mere speculation. Nonetheless, this Court need not decide whether the plaintiffs may now contest facts established on summary judgment or whether the affidavit of Silvia Bell creates a material issue of fact as to whether Dock Bell agreed to the settlement on the record. The jury by its special verdict has found the allegations of fraud, concealment, and a broad based cover up to be true. Therefore, regardless of whether there was or was not an effective settlement in 1961, the dismissal of the 1959 suit is no bar to this action. The plaintiffs' motion for an evidentiary hearing will therefore be denied.

Acknowledging the importance of finality in judicial proceedings, this Court is nonetheless convinced that the fraud in this case is sufficient to nullify an otherwise valid settlement and dismissal. This is not a case in which the defendant simply lied and thereby made the plaintiff's proof of his case difficult. Rather, this is a case of a massive conspiracy by high ranking Milwaukee officials to prevent the disclosure of the true facts of the shooting of Daniel Bell. Given the monopoly on force held by the government, this conspiracy prevented the proper functioning of the judicial system. Seeing no reason to alter the legal conclusion on this issue reached in the June 4, 1981, decision and order, this Court concludes that the 1961 settlement and the dismissal order which followed in the case of *Bell v. Grady and The City of Milwaukee*, No. 286,538 (Milwaukee County Circuit Court 1959), is no bar to this action.

## 2. STATUTE OF LIMITATIONS

■ The defendants argue that the statute of limitations bars this action. The bar would only apply to the claims arising immediately from the death of Daniel Bell and not to the conspiracy claims, since the conspiracy continued until 1978. This issue was also raised on motion for summary

judgment and decided in the June 4, 1981, decision and order at 9–14. There the Court concluded that the "allegations of a broadly based, racially motivated conspiracy by public officials and employees designed to conceal and cover-up the wrongful acts of a City of Milwaukee police officer, if true, are allegations of conduct so unfair, misleading, and outrageous as to outbalance the public interest in setting a limitation on bringing an action and thus carves an exception out of the statute of limitations." Decision and order of June 4, 1981, at 14.

The jury by its special verdict has found that these allegations were in fact true. The unique character of the fraud in this case, as noted above in discussing the effect of the 1961 settlement, indicates that the legal conclusion reached on this issue in the June 4, 1981, decision and order was correct. While the Bells may have suspected wrongdoing, mere suspicion cannot maintain a lawsuit. A claim cannot be said to arise until some evidence of its existence appears. Therefore, this Court concludes that the statute of limitations is no bar to this action.

## 3. SURVIVAL OF DANIEL BELL'S ACTIONS

The defendants raised the issue of the survival of Daniel Bell's actions on a motion to dismiss which was decided in the decision and order of October 20, 1980, at 3–4. 498 F.Supp. 1339, D.C.Wis. That decision and order held that only damages suffered by Daniel Bell before his death can survive to the benefit of his estate. It held that a cause of action for the death of Daniel Bell may be brought only by the deceased's family on their own behalf under Wisconsin's wrongful death statute, Wis.Stats. § 895.04. I have reconsidered that holding and have concluded that it was wrong.

■ The decision and order of October 20, 1980, stated at 3 that 42 U.S.C. § 1988 means that in a § 1983 action, where federal law is silent as to the appropriate rule of decision, a Court should turn to the law of the forum state in analogous areas and apply that as the rule of decision unless the

state rule is inconsistent with the federal policy behind § 1983. Thus, to determine whether a federal tort cause of action under § 1983 that occurred prior to death survives the deceased, we must examine whether the state survival statute provides for survival of analogous state tort causes of action.

■ Because the common law did not provide a tort cause of action for death, the states created such an action through wrongful death statutes. These statutes provide the closest tort analogy to a § 1983 claim based on the wrongful deprivation of a person's life. Under Wisconsin's wrongful death statute, Wis.Stats. § 895.04, the personal representative of the deceased may bring an action to recover for the loss of life. Thus, the Estate of Daniel Bell may recover for the loss of Daniel Bell's life.

■ A wrongful death statute that fails to allow recovery by the estate of the deceased is inconsistent with the compensatory and deterrent purposes of § 1983 where the § 1983 violation caused the death. In *Robertson v. Wegmann*, 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978), the Supreme Court held that a survival statute that allowed survival only in favor of a spouse, children, parents, or siblings, none of which the deceased had, was not inconsistent with the Constitution or laws of the United States under § 1988. The case indicates that the state law must be applied unless it is *generally* inconsistent or inhospitable to federal policies rather than just inconsistent or inhospitable in the particular case. The Court was careful to note, however, that they intimated "no view * * * about whether abatement based on state law could be allowed in a situation in which deprivation of federal rights caused death." 436 U.S. at 594, 98 S.Ct. at 1997.

To hold that the Estate of Daniel Bell could not recover under § 1983 for the loss of his life by a deprivation of his rights would be inconsistent with the compensatory policy, and especially inconsistent with the deterrent policy, underlying § 1983. Therefore, even if the Wisconsin wrongful death statute could not be read as allowing the estate to recover, this Court finds that the policies underlying § 1983 mandate that under federal law such recovery be allowed.

## 4. SURVIVAL OF DOLPHUS BELL'S CLAIMS

The Estate of Dolphus Bell, a/k/a Dock Bell, seeks to recover for those injuries directly suffered by Dock Bell, namely, his loss of the society and companionship of his son, the funeral expenses, and the deprivations of due process and racial equality he suffered as a result of the conspiracy. The Estate does not seek to recover for the loss of Daniel Bell's life on behalf of Daniel Bell. The issue presented here is whether recovery for the injuries suffered directly by Dolphus Bell may be had by Dolphus Bell's estate.

■ The parent-child relationship is protected by the Constitution. Its deprivation may be redressed under § 1983. Thus, if Dolphus Bell were alive, he could assert his claim.

■ In *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 317, 294 N.W.2d 437 (1980), the Wisconsin Supreme Court characterized a parent's claim for loss of the society and companionship of a child as a " 'personal injury right[ ] of action' " (quoting from *Peeples v. Sargent*, 77 Wis.2d 612, 643, 253 N.W.2d 459 (1977)), and it would follow that such a claim would survive the parent. The court recognized this as an independent right of the parents which had been invaded. The court's statement was made in the context, not of survivability, but of determining whether separate punitive damages may be awarded. Nonetheless, the Wisconsin Court would probably put Dolphus Bell's association rights within the category of "invasion of privacy" which is a category of tort that survives under the Wisconsin survival statute, Wis.Stats. § 895.01. Family associational interests are usually considered within "right of privacy." Thus, Dolphus Bell's § 1983 claim for loss of association would survive his death.

Finding a state law tort that is analogous to the loss of due process or racial equality rights is difficult. Nonetheless, Wis.Stats. § 895.01 provides that actions for false imprisonment or other damage to the person survive the deceased. These actions seem to be the closest state analog. Therefore, This Court concludes that the Estate of Dolphus Bell may recover for the injuries suffered by Dolphus Bell as a result of the conspiracy to cover up the true facts of the shooting of Daniel Bell.

## 5. SIBLINGS' INTEREST IN ASSOCIATION

Whether the brothers and sister of Daniel Bell have a constitutionally protected liberty interest in their association with Daniel Bell was briefly discussed on the defendants' motion to dismiss in the decision and order of October 20, 1980, at 4–6. That decision stated: "A § 1983 action may be based on the death of a relative if the relevant state wrongful death action would permit such an action." *Id.* at 4–5. The decision concluded that "under Wisconsin law the brothers and sisters [sic] may not recover for loss of society and companionship." *Id.* at 5. This conclusion was in error.

As stated earlier, 42 U.S.C. § 1988 directs a court to turn to state law where federal law does not provide a rule of decision. But whether a person has a cause of action under § 1983 is an issue for which § 1983 itself provides the rule of decision. It states that one who is deprived of "any rights, privileges, or immunities secured by the Constitution" may recover.[1] Thus, if the brothers and sister have a constitutional right to the association of their brother Daniel, § 1983 gives them a cause of action for the deprivation of that right.

The existence of a constitutionally protected associational interest between siblings is an open question. The one case found that has examined this question, *Sanchez v. Marquez,* 457 F.Supp. 359 (D.C.Colo. 1978), held that no such interest exists. The Court's reasoning was minimal. Another case, not involving the death of a sibling, found no constitutional right to the "well-being" of a sibling. See *Jones v. McElroy,* 429 F.Supp. 848, 853 (E.D.Pa. 1977).

However, the view that there exists a constitutional liberty interest in association between siblings is supported by the Seventh Circuit case of *Drollinger v. Milligan,* 552 F.2d 1220, 1226–27 (7th Cir. 1977). It held that a man has a constitutionally protected interest in the nurturing and development of a grandchild. The claim was that conditions of his daughter-in-law's probation interfered with his association with his granddaughter. Specifically, the daughter-in-law could not leave his granddaughter at his home for any period of time.

The Seventh Circuit viewed the constitutional protections of family relationships broadly, saying that due process, while usually applied to the nuclear family, should also extend to the grandfather-grandchild relationship. 552 F.2d at 1227 n. 6. The Court referred to the usual right of privacy cases. That was about the extent of its reasoning. The Supreme Court later confirmed the Seventh Circuit's view in *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1976).

Since siblings are members of the nuclear family, their associational interests appear as deserving of constitutional protection as a grandparent-grandchild relationship. For this reason, this Court concludes that the association between siblings is an interest protected by the Fourteenth Amendment and that the brothers and sister of Daniel Bell may sue under § 1983 on their own behalf for their loss of the association with Daniel Bell.

1. 42 U.S.C. § 1983:
  "§ 1983. Civil action for deprivation of rights
  "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

### 6. DO THE BROTHERS AND SISTER AND THE ESTATE OF DOLPHUS BELL HAVE A CAUSE OF ACTION ARISING FROM THE CONSPIRACY?

The defendants argue that the civil rights laws confer no cause of action for a conspiracy to cover up the true facts of a shooting death where the concealment is by perjury in judicial proceedings. However, the two cases cited by the defendants in their memorandum in support of their post-verdict motions are inapposite.

*Guyton v. Phillips*, 606 F.2d 248 (9th Cir. 1970), held that a deceased's estate could not recover for a conspiracy which occurred after the death, since a dead person is not a "person" as that term is used in §§ 1983 and 1985. But in this action, Dolphus Bell, through his estate, and the brothers and sister of Daniel Bell have suffered injuries themselves caused by a conspiracy that took place during their lives.

█ In *Hurlburt v. Graham*, 323 F.2d 723 (6th Cir. 1963), the Court only held that mere perjury by police officers did not constitute a violation of the Civil Rights Act. The evidence of a conspiracy in this case goes far beyond mere perjury in a judicial proceeding. There appears to be no reason why the conspiracy claims may not be asserted by the Estate of Dolphus Bell and the brothers and sister of Daniel Bell.

### 7. IS § 1985(2) THE EXCLUSIVE CONSPIRACY REMEDY?

█ The defendants submit that 42 U.S.C. § 1985(2)[2] is the exclusive remedy for the conspiracy and that therefore the plaintiffs may be compensated only for deprivation of racial equality and not for due process. But the Seventh Circuit has allowed conspiracy claims to be prosecuted simultaneously under §§ 1983 and 1985(3), see *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1970), rev'd in part on other grounds, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980), and no reason for a different result with § 1985(2) is suggested.

The reference to § 1985(2) in the decision and order of October 20, 1980, at 5–6, as the basis for the conspiracy claim of the brothers and sister was not meant to imply that that was the exclusive basis for a conspiracy claim. The denial of due process and the denial of racial equality are two separate wrongs and are not redundant, so recovery may be had for both losses.

### 8. APPLICABILITY OF THE WISCONSIN WRONGFUL DEATH STATUTE LIMITATIONS

The defendants have argued that the damages arising from the death of Daniel Bell should be limited by the limits imposed by Wisconsin's wrongful death statute. Wis.Stats. § 895.04(4) reads as follows:

> "(4) Judgment for damages for pecuniary injury from wrongful death may be awarded to any person entitled to bring a wrongful death action. Additional damages not to exceed $25,000 for loss of society and companionship may be awarded to the spouse or unemancipated or dependent children, or parents of the deceased."

---

**2.** 42 U.S.C. § 1985(2):

"§ 1985. Conspiracy to interfere with civil rights

      *    *    *

"(2) Obstructing justice; intimidating party, witness, or juror. If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws; * *.*."

The limitation on recovery imposed by subsection (4) is similar to that of the Colorado statute in *Espinoza v. O'Dell*, 633 P.2d 455 (Colo.Sup.1981), —— U.S. ——, 102 S.Ct. 969, 71 L.Ed.2d 105 (1981). The Colorado Supreme Court concluded that its wrongful death statute was designed to protect the property interests of the heirs. Similarly, the purpose of Wisconsin's wrongful death statute is to compensate survivors for the pecuniary benefits they would have derived from the earning power of the deceased if he had lived. *Nichols v. United States Fidelity & Guaranty Co.*, 13 Wis.2d 491, 109 N.W.2d 131 (1961).

█ There are two reasons that the wrongful death statute's damage limitation does not apply to a § 1983 action brought to recover for loss of life. The first is that the limitation is inconsistent with the compensation and deterrence policies of § 1983; the second is that damage issues are a matter of federal law.

*Espinoza* failed to properly analyze the relationship between § 1983 law and wrongful death statutes. It did correctly note the deterrence and compensation policies of § 1983. However, when examining whether the limitation is consistent with those policies, the Court discussed the right of the decedent's children to be compensated for their constitutional liberty interest in family life. The problem with this is that the wrongful death statute is the state law most analogous, not to the children's claim on their own behalf under § 1983 for loss of association, but to the claim of the decedent under § 1983 for loss of life.

There is really no way to compensate someone for the loss of his life. However, at the least, every life is worth something. Yet if pecuniary loss to the heirs were the sole limit, the loss of the life of someone with a minimal earnings capacity would go totally uncompensated. This is in fact the case with Daniel Bell. Similarly, a pecuniary loss limit would prevent Daniel Bell's heirs, through his estate, from being compensated for Daniel Bell's loss of the future enjoyment of life. As the Supreme Court said in *Robertson v. Wegmann*, 436 U.S.

584, 588, 98 S.Ct. 1991, 1994, 56 L.Ed.2d 554 (1978), the ultimate rule adopted under § 1988 is a federal rule responsive to the need whenever a federal right is impaired. Here the federal right at stake is the right to life, and the loss of life, not loss of inheritance, is the injury which must be compensated. As a general matter, the limitation prevents adequate compensation for this loss and, therefore, is inconsistent with the compensation purpose of § 1983.

Similarly, such a limitation precludes exemplary damages which further the deterrent purpose where the deprivation was in bad faith. The Supreme Court has stated that there is nothing to suggest that Congress intended a stronger deterrent under § 1983 than that inherent in compensatory damages, *Carey v. Piphus*, 435 U.S. 247, 256–257, 98 S.Ct. 1042, 1048–1049, 55 L.Ed.2d 252 (1978), so that damages could not be presumed. But the Court added that this is not to say that punitive damages may not be awarded in a proper case. 435 U.S. at 257 n. 11, 98 S.Ct. at 1049 n. 11. The Seventh Circuit has upheld punitive damages where aggravating circumstances are proven. *Spence v. Staras*, 507 F.2d 554, 558 (7th Cir. 1974). Because as a general matter the limitation precludes an award of punitive damages where such is warranted to provide additional deterrence, the limitation is inconsistent with the deterrent policy of § 1983 also.

The Seventh Circuit arguably accepted a similar pecuniary loss limitation under Illinois' wrongful death law in *Spence*. The court seemed to accept that since the plaintiff could sue both under a survival statute for damages occurring prior to death as well as under the wrongful death statute, the pecuniary loss limitation becomes moot. The court of appeals merely held that the complaint sufficiently alleged damages so that regardless of whether state or federal rules on damages were applied, the complaint withstood a motion to dismiss. Because the issue of whether loss of life was a separate compensable injury under § 1983 was apparently not placed before the court of appeals, *Spence* is not controlling.

The second reason the damage limitation does not apply is that courts have not usually turned to state law to resolve the question of damages. In *Spence*, the Seventh Circuit held that "punitive damages are recoverable *under federal law* in a § 1983 action [citing federal cases] and under Illinois law * * *." 507 F.2d at 558 (emphasis added). The court added: "Federal law, furthermore, permits recovery of such damages [punitive] in actions under the civil rights acts even in the absence of actual loss to the plaintiff. *Rogers v. Loether*, 467 F.2d 1110, 1112 n. 4 (7th Cir. 1972); * * *." 507 F.2d at 558. The court footnoted that under Illinois law, one must have actual damages before recovering punitive damages. 507 F.2d at 528 n. 4.

The Supreme Court in *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969), indicated that damage issues could be resolved by reference either to state law or federal law. *Sullivan* held that under § 1982 a damage remedy was available against discriminatory disposition of property. The Court referred to § 1988 and said that it meant both federal and state rules on damages may be used, whichever better serve federal policies.

Nonetheless, in *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), the Supreme Court held municipalities immune from punitive damages without reference to the law of the forum state. It instead tried to discern whether Congress in 1866 had intended to disturb the usual common law rule and looked to public policy for guidance.

Lastly, *Basista v. Weir*, 340 F.2d 74 (3d Cir. 1965), held that damage issues, both compensatory and punitive, were governed by federal common law. The reasoning was that a federal right was invaded so that the federal courts must grant necessary relief. The Court also cited the need for uniformity.

In short, damage issues are matters for federal common law and resort to state law in the first place is not required. The injured federal interest is life, and § 1983

intended such losses to be fully compensated. Therefore, the limitations of Wis.Stats. § 895.04(4) do not apply in this action.

## 9. INDISPENSABLE PARTIES

The defendants claim that the plaintiffs have failed to join as indispensable parties the Estates of William McCauley, Rudolph Glaser, and Leo Woelfel. The plaintiffs have moved to add as defendants those parties.

This Court's decision and order of January 6, 1982, held that the Estate of William J. McCauley did not have a legal interest relating to the transaction that is the subject matter of this suit, and, thus, this Court held that the Estate of William McCauley could not intervene of right under Rule 24(a) of the Federal Rules of Civil Procedure. The same finding compels the conclusion that the Estate of William McCauley is not a person to be joined if feasible under Rule 19(a) of the Federal Rules of Civil Procedure and cannot be an indispensable party.

With respect to the need to join, the Estates of Leo Woelfel and Rudolph Glaser are in the same position as the Estate of William McCauley. There is no reason a final adjudication of this case cannot be reached in their absence. Their position is analogous to that of unindicted coconspirators.

Nor may the plaintiffs at this late date add these estates as parties. They were never named in the complaint and had no opportunity to defend this action. To bind their estates with this verdict would be a gross violation of due process, not a mere amendment of the pleadings to conform to the evidence.

## 10. NEW TRIAL AGAINST COUNTY AND DISTRICT ATTORNEY'S OFFICE

On December 3, 1981, upon a motion for a directed verdict by defendants Milwaukee County and the Milwaukee County District Attorney's Office, this Court dismissed the complaint as to these defendants. The di-

rected verdict was based on two grounds: (1) that there was no evidence from which a reasonable jury could conclude that any cover up by the County or District Attorney's Office was pursuant to a county policy, custom, or practice as required by *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); (2) that even without *Monell*, the District Attorney is absolutely immune from prosecution, and that immunity would have to attach to the Office of the District Attorney if, as the plaintiffs argued, the office was so intertwined with the District Attorney so that his actions are attributable to it.

The plaintiffs now seek a partial new trial as to the liability of the defendants Milwaukee County and the Office of the Milwaukee County District Attorney for punitive damages. The plaintiffs claim a partial new trial is justified because although the jury found that former District Attorney William McCauley had participated in the conspiracy, no question about appropriate punitive damages was submitted to the jury. This Court did not permit such a question because the County and the District Attorney's Office had been dismissed as parties defendants.

The jury's finding that McCauley participated in the conspiracy does not affect the reasons for which the County and the District Attorney's Office were given a directed verdict. McCauley's name was improperly included in special verdict question number C1. The names of Leo Woelfel and Rudolph Glaser were added to question C1 in case on some theory the plaintiffs have a direct action against the City of Milwaukee for their misdeeds. Since special verdict question C1 with respect to McCauley could in no way affect the legal liabilities of any of the defendants, it was error to submit it to the jury. McCauley's name and the answer that follows it under question number C1 will be ordered stricken.

## 11. MUNICIPAL LIABILITY UNDER FEDERAL LAW

By its proposed judgment, the plaintiffs seek to hold the City of Milwaukee liable for the death of Daniel Bell and the subsequent cover up of the true facts surrounding the shooting of Daniel Bell. They set forth various theories for attaching liability to the city under federal law. The plaintiffs argue that the City is liable under § 1983 according to the standards announced by *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The plaintiffs also argue that the City can be held directly liable, apparently on a theory of *respondeat superior*, under 42 U.S.C. §§ 1981, 1985(2), 1985(3), and 1986.

The plaintiffs' assertion that the City is liable under *Monell* cannot stand. *Monell* holds that a city cannot be held liable under § 1983 on a theory of *respondeat superior*. Rather, liability attaches only if it is shown that the deprivation of rights was pursuant to a policy statement, ordinance, regulation, decision officially adopted and promulgated, or custom, usage, or practice. 436 U.S. at 690–691, 98 S.Ct. at 2035–2036.

Plaintiffs had submitted to the jury a question as to whether the City of Milwaukee had a policy, practice, custom, or usage on February 2, 1958, of advising its police officers to plant a throwaway knife on the victim of a police shooting, see special verdict question number C3, but during the course of the jury's deliberations the plaintiffs moved and were permitted to withdraw this question. No other basis for finding an unconstitutional act pursuant to municipal policy, practice, custom, or usage can be found from the special verdict. Therefore, the City cannot be held liable under § 1983.

The *Monell* standard of municipal liability must also be applied under §§ 1985(2), 1985(3),[3] and 1986.[4] Prior to

---

**3.** 42 U.S.C. § 1985(3):

"(3) Depriving persons of rights or privileges. If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of

depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immuni-

**4.** See note 4 on page 473.

*Monell, Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), had held municipalities immune from § 1983 liability. Lower courts, including the Seventh Circuit, read this as also indicating that municipalities could not be held liable under § 1985, see, e.g., *Hampton v. City of Chicago*, 484 F.2d 602, 610 (7th Cir. 1973), cert. denied, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974); *Johnson v. City of Cincinnati*, 450 F.2d 796 (6th Cir. 1971), or under § 1986, see, e.g., *Ries v. Lynskey*, 452 F.2d 172 (7th Cir. 1971). They reasoned that these statutes were all part of the Civil Rights Act of 1871 and that the term "person" was intended to have the same meaning under these sections. The intent to exclude municipalities as "persons" was an intention of the entire act, not just what was to become § 1983.

*Monell* reversed *Monroe's* holding that municipalities were immune under § 1983, but nonetheless held that the Congress that passed the Civil Rights Act of 1871 did not intend thereby to create *respondeat superior* liability under § 1983. The Court based this conclusion on two grounds. First, the language of § 1983 is narrow and imposes a strict causal connection. The language of §§ 1985 and 1986 is not quite so restrictive with respect to causation, so this ground would not apply to these sections.

But the Court also found that Congress had implicitly rejected the policy reasons for municipal *respondeat superior* liability when it rejected the Sherman amendment. This ground applies to the 1871 Act as a whole and suggests that Congress did not intend municipal *respondeat superior* liability under §§ 1985 and 1986.

The Second Circuit, the only circuit court to have examined this question, has held that the *Monell* standard must be applied under § 1985. *Owens v. Haas*, 601 F.2d 1242 (2nd Cir.), cert. denied 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1980). The only case found that has examined this issue with respect to § 1986 has also held that *Monell* must be applied under that section. *Vasquez v. City of Reno*, 461 F.Supp. 1098 (D.C.Nev.1978). This Court likewise concludes that the City of Milwaukee is directly liable under §§ 1985(2), 1985(3), and 1986 only if *Monell* liability is established. As stated above, no finding of *Monell* liability has been made. Therefore,

---

ties under the laws, or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice-President, or as a member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

**4.** 42 U.S.C. § 1986:
"§ 1986. Action for neglect to prevent conspiracy

"Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in the preceding section [42 USCS § 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action, and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding five thousand dollars damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued."

the City of Milwaukee cannot be held liable under §§ 1985(2), 1985(3), or 1986.

The last section under which the City could be held directly liable under a *respondeat superior* theory is § 1981.[5] Prior to *Monell*, a number of courts, including the Seventh Circuit, concluded that the municipal immunity that *Monroe v. Pape* recognized under § 1983 did not apply to § 1981. See *Garner v. Giarrusso*, 571 F.2d 1330, 1338–41 (5th Cir. 1978); *United States v. City of Chicago*, 549 F.2d 415, 424–425 (7th Cir. 1977); *Mahone v. Waddle*, 564 F.2d 1018 (3d Cir. 1977), cert. denied 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978); *Sethy v. Alameda County Water District*, 545 F.2d 1157 (9th Cir. 1976).

The reason the immunity did not apply to § 1981 was that "the language, purpose, and legislative history of section 1981 differ substantially from those of section 1983." 549 F.2d at 425. Section 1981 originated as § 1 of the Civil Rights Act of 1866, not as part of the Civil Rights Act of 1871. Although persons who could not be subjected to liability under § 1983 may be subjected to liability under § 1981, the scope of § 1981 is narrower in that it protects only against discrimination on the basis of race or alienage. 571 F.2d at 1340.

■ The holding of these cases remains unchanged by *Monell*. *Monell's* refusal to find municipal liability under § 1983 on a *respondeat superior* theory was based on the language of § 1983 and the legislative history of the Civil Rights Act of 1871, particularly with respect to the Sherman Amendment. An incorrect reliance on the legislative history surrounding the Sherman Amendment was largely responsible for the *Monroe v. Pape* immunity which was held not to apply to § 1981. "An examination of the legislative history surrounding § 1981 * * * reveals nothing comparable to the rejection of the Sherman Amendment

to the 1871 Act * * *." 571 F.2d at 1340. Thus, this Court concludes that *Monell* does not dictate that municipal liability under § 1981 be limited to liability for acts pursuant to municipal policy, practice, custom, or usage. See generally, *Comment: Developments in the Law—Section 1981*, 15 Harv.C. R.–C.L.L.Rev. 29, 204–210 (1980).

There remains the issue of whether the City is liable for punitive damages under § 1981. In 1973, the Seventh Circuit held that under § 1982, which also originated in the Civil Rights Act of 1866, and under § 1983, municipalities could be held liable for punitive damages. *Morales v. Haines*, 486 F.2d 880 (7th Cir. 1973). This holding is equally applicable to § 1981.

The Supreme Court has recently held, however, that punitive damages against municipalities may not be recovered under § 1983 even when *Monell* liability is established. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). *City of Newport* thereby overruled *Morales'* holding with respect to § 1983. This Court now holds that *City of Newport* implicitly overrules *Morales'* holding with respect to § 1982, and thus Morales' application to § 1981, and that punitive damages may not be assessed against a municipality under § 1981.

Unlike the reasoning of *Monell*, the reasoning of *City of Newport* is equally applicable to both the Civil Rights Act of 1866 and the Civil Rights Act of 1871. The starting point for the Court in *City of Newport* was that "members of the 42d Congress were familiar with common law principles * * * and that they likely intended these common law principles to obtain, absent specific provisions to the contrary." 453 U.S. at 258, 101 S.Ct. at 2755, 69 L.Ed.2d at 626. There is no reason to make a different assumption about the Congress that passed the 1866 Act. And at that time, the immunity of a municipal corpora-

---

5. 42 U.S.C. § 1981:

"§ 1981. Equal rights under the law

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to

the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

tion from punitive damages at common law was well established. See 453 U.S. at 258, 101 S.Ct. at 2755, 69 L.Ed.2d at 627.

The Court then searched for anything in the legislative debates that would suggest that the 42d Congress had intended to abolish the common law municipal immunity from punitive damages. Finding no such indication, the Court examined the goals of § 1983 and their relationship to the policies underlying punitive damages—retribution and deterrence—and found that neither would be significantly advanced through punitive damages assessed against a municipality. Thus, the Court held that municipalities must be immune from punitive damages in § 1983 actions.

■ The foregoing observations are equally valid as applied to § 1981. As the First Circuit recently held: "We are not only bound by the holding of *Fact Concerts* but must also defer to its reasoning; and the Court's discussion of the rationale for levying punitive damages leaves no room for distinguishing § 1981 from § 1983." *Heritage Homes of Attleboro, Inc. v. The Seekonk Water District*, 670 F.2d 1 (1st Cir. 1982). Therefore, § 1981 does not permit this Court to award the plaintiffs punitive damages against the City of Milwaukee.

## 12. MUNICIPAL LIABILITY AS INDEMNITOR

■ The plaintiffs have requested that this court award judgment against the City of Milwaukee as the indemnitor of the individual defendants under Wis.Stats. § 895.-46. However, nowhere in the plaintiffs' second amended complaint was a claim made against the City as the indemnitor of the individual defendants. The plaintiffs directed the Court to their seventh cause of action as such a claim, but the Court could not find that a fair reading of the seventh cause of action put the defendant City on notice that it was being sued as an indemnitor. Nor was such a claim indicated on the "Chart of Plaintiffs' Claims" which was filed on September 8, 1981.

Nonetheless, whether the City must indemnify the individual defendants for the judgments against them is an issue that has received much attention in this case. Both the plaintiffs and the defendant City have submitted memoranda on the issue.

At oral argument on January 8, 1982, the plaintiffs moved to amend their complaint to add the indemnity claim. Rule 15(b) of the Federal Rules of Civil Procedure gives the Court discretion to allow amendment of the pleadings to conform to the evidence even after judgment. The indemnity issue is strictly a legal issue. Thus, although no evidence was taken on it, the issue was fully briefed and argued.

The issue has been tried by the implied consent of the parties. Since the claim did not come as a surprise to the defendant City of Milwaukee, the Court granted the motion to add subject to the plaintiffs' submitting a written motion to amend by January 11, 1982.

■ The written motion moved to add an indemnity claim not only against the City but also against Milwaukee County. Since the claims against the County have been dismissed, and since the jury finding with respect to William McCauley in special verdict question number C1 has been struck, the motion to amend is not granted with respect to the County but is granted with respect to the City of Milwaukee.

The parties were given until January 15, 1982, to submit any additional memoranda on the indemnity issue. On January 19, 1982, the City filed its objection to the amendment because of its late date and because it could create a conflict of interest situation among Mr. Konrad's clients: the City, Mr. Johnson, and Mr. Shaffer. The City apparently did not understand that at oral argument on January 8, 1982, the Court explicitly and in clear terms granted the plaintiffs' motion to amend, and the Court intended the City to reply by the January 15, 1982, deadline. The City stated that it will not answer the amendment until the Court rules that it will permit amendment and rules what action should be taken by the office of the City Attorney to insure that defendants Johnson and Shaffer re-

ceive adequate representation. Since that time the City has been notified that the Court did grant the plaintiffs' motion to amend at the January 8, 1982, oral argument and has had the opportunity to respond.

Defendant Grady, on January 15, 1982, filed a motion to amend his answer to add a crossclaim for indemnification against the City. Since this crossclaim presents the identical issue as the plaintiffs' claim against the City as the indemnitor of Thomas Grady, the amendment will be allowed.

■ This court has pendent jurisdiction over this state law claim for indemnity.

Wis.Stats. § 895.46[6] provides that a defendant public employee against whom a judgment of damages and costs is entered for activities within the scope of employment shall be indemnified by the political subdivision which employed the defendant. The governmental unit also must pay the reasonable attorneys' fees and costs of defending the action.

■ Defendant Grady may crossclaim against the City as the indemnitee under the statute. The plaintiffs may also sue the City because the Wisconsin Supreme Court has construed § 895.46 as allowing a direct action against the indemnitor by the person in whose favor judgment against the indemnitee was entered. See *Fiala v. Voight*, 93 Wis.2d 337, 347–48, 286 N.W.2d 824 (1980); *Larsen v. Lester*, 259 Wis. 440, 49 N.W.2d 414 (1951).

■ The plaintiffs seek to carry this notion of a direct action further by claiming that the City is liable to the plaintiffs not only for the judgments awarded against defendants Grady, Johnson, and Shaffer, but also for the punitive damages that the jury found would be appropriate against Glaser and Woelfel who were not defendants in this action. Such an extension of the direct action ignores the entire meaning of indemnity.

Without a judgment against someone entitled to indemnification, there is nothing for the City to indemnify. The state legislature passed § 895.46 so that governmental employees would not have to pay out of their own pocket judgments arising out of their official duties. *Horace Mann Insurance Co. v. Wauwatosa Board of Education*, 88 Wis.2d 385, 389, 276 N.W.2d 761 (1979). But Glaser and Woelfel, or more precisely since both are deceased, the Estates of Glas-

---

6. Wis.Stats. § 895.46(1)(a):

"895.46  State and political subdivisions thereof to pay judgments taken against officers

"(1)(a) If the defendant in any action or special proceeding is a public officer or employe and is proceeded against in an official capacity or is proceeded against as an individual because of acts committed while carrying out duties as an officer or employe and the jury or the court finds that the defendant was acting within the scope of employment, the judgment as to damages and costs entered against the officer or employe in excess of any insurance applicable to the officer or employe shall be paid by the state or political subdivision of which the defendant is an officer or employe. Agents of any department of the state shall be covered by this section while acting within the scope of any written agreement entered into prior to the occurrence of any act which results in any action or special proceeding. Regardless of the results of the litigation the governmental unit, if it does not provide legal counsel to the defendant officer or employe, shall pay reasonable attorney fees and costs of defending the action, unless it is found by the court or jury that the defendant officer or employe did not act within the scope of employment. If the employing state agency or the attorney general denies that the state officer, employe or agent was doing any act growing out of or committed in the course of the discharge of his or her duties, the attorney general may appear on behalf of the state to contest that issue without waiving the state's sovereign immunity to suit. Failure by the officer or employe to give notice to his or her department head of an action or special proceeding commenced against the defendant officer or employe as soon as reasonably possible is a bar to recovery by the officer or employe from the state or political subdivision of reasonable attorney fees and costs of defending the action. The attorney fees and expenses shall not be recoverable if the state or political subdivision offers the officer or employe legal counsel and the offer is refused by the defendant officer or employe. If the officer, employe or agent of the state refuses to cooperate in the defense of the litigation, the officer, employe or agent is not eligible for any indemnification or for the provision of legal counsel by the governmental unit under this section."

er and Woelfel are not liable for anything. Thus, the City has no one to indemnify. The Wisconsin cases that have allowed direct action are all cases in which the indemnitee was also a party to the suit against whom any judgment would work. Thus, the City cannot be held liable for the punitive damages that the jury indicated would be appropriate against Woelfel and Glaser were they defendants.

With respect to defendants Johnson and Shaffer, the City agreed at oral argument on January 8, 1982, to indemnify them without arguing the merits of their claims. To such an end, the City states that they admitted in their answer that at all times Johnson and Shaffer acted within the scope of their employment. See letter to the court from Mr. Konrad, dated January 19, 1982, at 2 (apparently referring to defendant City's answer, filed December 29, 1980, ¶ 61).

The simultaneous representation of defendants Johnson, Shaffer, and City of Milwaukee by the office of the City Attorney presents a conflict of interest only if the City is unwilling to be legally bound to indemnify Johnson and Shaffer. The City has indicated it was willing to be bound, although it did not wish to concede the merits of Johnson and Shaffer's claims on some of the issues involved, somewhat like a civil *nolo contendere* plea. Thus, the Court will enter judgment against the City as indemnitor for the judgment against Johnson and Shaffer.

The City does contest its responsibility to indemnify defendant Grady by arguing that Grady's actions took him outside the scope of employment as that term is used in § 895.46. The City apparently argues that because Grady knowingly lied to police officials during the investigation of the shooting and perjured himself during the inquest, he was acting on his own behalf, not on behalf of his employer.

The actions taken by Grady during the chase and shooting of Daniel Bell and during the subsequent investigation, had they been done in good faith, would unques-

tionably be among the duties of a police officer and thus within the scope of employment. The duties of a police officer are not limited to the prevention of crime and apprehension of criminals. Rather, they include participation in investigations, reporting to superiors, and giving testimony at hearings and in court.

The essence of the City's claim is that § 895.46 only intended to indemnify employees for the good faith performance of their duties, and, therefore, Grady's bad faith removes him from the statutes' coverage. Under the indemnity statute in effect in 1958, Wis.Stats. § 270.58 (1957), this argument would seem to have merit. That statute provided for indemnification only if the jury or the court found that the officer acted in good faith.

However, in 1973 the state legislature amended the statute, substituting the scope of employment requirement for the good faith requirement. See 1973 Wis.Laws Ch. 333 § 173p. The import of this change is to make the scope of employment the litmus test for determining whether a political subdivision of the state must pay a judgment entered against its employee. It thus becomes critical whether the 1958 version or the present version of the indemnity statute governs.

This Court holds that the present version of the indemnity statute, Wis.Stats. § 895.46, governs this case. As a general rule, a court should "apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. School Board of the City of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). In this case, application of § 895.46 would not result in manifest injustice, nor has any statutory directive or legislative history to the contrary been called to the Court's attention.

Further reason for applying the present version is that the indemnitee's rights under the statute do not arise until a judgment is entered against him. Thus, the

relevant event for indemnity purposes occurred not in 1958 but in 1982.

The Wisconsin Supreme Court has not directly decided whether the indemnity statute to be applied should be that in effect at the time of the underlying acts by the employee or that in effect at the time of trial. In *Horace Mann Insurance Co. v. Wauwatosa Board of Education*, 88 Wis.2d 385, 389 n. 2, 276 N.W.2d 761 (1979), the court applied the version in effect at the time of the employee's acts, noting that the parties did not dispute that that was the applicable version. However, in *Cameron v. City of Milwaukee*, 102 Wis.2d 448, 307 N.W.2d 164 (1981), the court applied the version in effect at the time of the suit even though the underlying acts occurred in 1972, prior to the 1973 amendments. This Court thus finds little guidance on this issue from the state supreme court and will apply the present indemnity statute, § 895.46.

■ Under this statute, the Court holds that defendant Grady was acting within the scope of his employment. In so holding, the Court recognizes that bad faith may be relevant to the determination of whether an employee was within the scope of employment. See *Linden v. City Car Co.*, 239 Wis. 236, 238–39, 300 N.W. 925 (1941). However, the Wisconsin Supreme Court has noted that "[t]he scope of employment has also been defined to include those acts which are 'so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment.'" *Cameron*, 102 Wis.2d at 457, 307 N.W.2d 164 (quoting Prosser, Law of Torts, 460–61 (4th ed.)).

While Grady's actions were unquestionably designed to further his own objective of escaping punishment for his wrongdoing, they also were designed to further the objectives of his employment. He was performing his duties as a police officer but used quite improper methods of carrying out those duties.

Thus, this Court concludes that the City of Milwaukee must indemnify defendant Grady for the judgments against him respecting the shooting of Daniel Bell and the subsequent cover up of the true facts surrounding the shooting.

13. PREJUDGMENT INTEREST

The plaintiffs' proposed judgment includes an award of interest since 1958 on those damages awarded in part "B" of the special verdict, that is, damages for the death of Daniel Bell. Plaintiffs argue that on the authority of *First National Bank of Chicago v. Material Service Corp.*, 597 F.2d 1110 (7th Cir. 1979), and *Columbia Broadcasting System v. Zenith Radio Corp.*, 537 F.2d 896 (7th Cir. 1976), they are entitled to prejudgment interest.

This Court does not find these cases controlling. *Columbia Broadcasting System* was a patent case where the determination of prejudgment interest rested on statutory interpretation of the patent laws. *First National Bank* was a wrongful death action under general maritime law. The circuit court extended to general maritime law holdings adding prejudgment interest to maritime death awards under the Jones Act, 46 U.S.C. § 688 (1976), and the Death on the High Seas Act, 46 U.S.C. §§ 761–768 (1976). However, one of the principal cases upon which the circuit court relied noted: "Admiralty thus stands on a different footing from the common law in this respect, for the general rule in common law had traditionally been that prejudgment interest could not be allowed on an unliquidated tort claim." *National Airlines, Inc. v. Stiles*, 268 F.2d 400, 405 (5th Cir.), cert. denied, 361 U.S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121 (1959). Thus, the holding of *First National Bank* should not automatically be extended to civil rights claims.

The First Circuit has held that under 42 U.S.C. § 1983, regardless of whether prejudgment interest is discretionary or totally barred, federal law dictates that the jury should decide whether or not to assess it. *Furtado v. Bishop*, 604 F.2d 80, 98 (1st Cir. 1979), cert. denied, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980). The Court re-

jected the mandatory award of prejudgment interest because the injuries suffered by plaintiffs in civil rights actions are often intangible. The Court noted that the common law barred prejudgment interest on an unliquidated tort claim but declined to hold such rule binding under § 1983 because the rule has been criticized and because the common law is not binding on § 1983, 604 F.2d at 98 (citing *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)). The Court held that in either case, under federal law the issue was one to be decided by the jury.

This Court holds that the reasoning of the First Circuit in *Furtado* is equally applicable in this case. The Supreme Court observed in *Jones v. United States*, 258 U.S. 40, 49, 42 S.Ct. 218, 220, 66 L.Ed. 453 (1922), that "[t]he usual rule in tort cases has been to leave the question of interest to the jury." The Court let a prejudgment interest award by the judge stand in that case because the case involved deprivation of property with a definite or ascertainable value. In this case, the damages are indefinite, involving the value of a life. The interest question should have been presented to the jury but was not. This Court cannot now add prejudgment interest.

Even if it were the province of this Court to award prejudgment interest in its discretion, the Court would decline to award it. An instruction submitted to the jury at the plaintiffs' request expressly told the jury to consider the passage of time in determining the amount of damages. See the jury instructions at pp. 40, 49. Furthermore, the jury certainly was not instructed that their award should be in terms of 1958 dollars upon which interest to date would be added. Thus, prejudgment interest must be denied.

THEREFORE, IT IS ORDERED that:

1. The plaintiffs' motion for a partial new trial as to the issue of punitive damages as to the defendants Milwaukee County and the Office of the Milwaukee County District Attorney is DENIED.

2. The plaintiffs' motion to amend and supplement to add as parties defendant the Estates of Leo Woelfel, Rudolph Glaser, and William McCauley is DENIED.

3. The motion of the defendant City of Milwaukee for dismissal as a party defendant is DENIED.

4. The defendants' post-verdict motions with respect to the prior settlement/res judicata, the statute of limitations, laches, survival of actions to the Estates of Dolphus Bell and Daniel Bell, the brothers and sister of Daniel Bell, exclusivity of the conspiracy remedy under 42 U.S.C. § 1985(2), and application of state wrongful death statute limitations are DENIED.

5. The defendants' motion to amend post-verdict motions is DENIED.

6. In special verdict question number C1, the name of William McCauley and the answer following is stricken from the special verdict.

7. The plaintiffs' motion for an evidentiary hearing on the 1961 settlement is DENIED.

8. The plaintiffs' motion to amend the second amended complaint to add a claim of indemnity against the City of Milwaukee is GRANTED, but the plaintiffs' motion to amend the second amended complaint to add a claim of indemnity against Milwaukee County is DENIED.

9. The motion of defendant Thomas Grady, Jr., to amend his answer to add a crossclaim against the defendant City of Milwaukee for indemnification under state law is GRANTED.

10. The attached form of judgment will be entered.